**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VICTORIA NASSIF, CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, LINDSEY DORCUS, ROBIN AMER, and YOHANCE LACOUR, each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation, and SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiffs, Victoria Nassif, Carol Marin, Philip Rogers, Alison Flowers, Robin Amer, Lindsey Dorcus, and Yohance Lacour, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendants Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. (collectively, "Samsung"), allege as follows:

**NATURE OF THE CASE**

1.      "AI for All." That is how Samsung introduced Galaxy AI to the world at CES 2024, the largest consumer-technology trade show in the United States, under a Samsung Newsroom headline that read "Samsung's 'AI for All'

Vision Unveiled at CES 2024." Samsung Research, the parent corporation's global R&D organization, adopted the same phrase as its institutional mission: "Under the vision of 'AI for All,' Samsung plans to integrate AI services across all product lines, enabling users to enjoy a more convenient and enriched daily life." Two years later, at CES 2026, Samsung unveiled a Brain Health voice-biomarker service that uses Samsung's foundational voice-AI models to assess users' cognitive health from short audio samples. AI for All. From mobile translation to medical screening. Samsung says so itself.

2.      But the AI Samsung built was not for all. To the users of its Galaxy phones, tablets, watches, and earbuds, Samsung built a consent infrastructure: the Bixby Custom Voice Creator lets a user record prompted sentences on-device and authorize the cloning of the user's own voice. Samsung's U.S. Privacy Policy tells those users that "certain Services may use your biometric data" — voiceprint data — to create a customized Bixby Voice wake-up command. Samsung's consumer-facing privacy webpage tells those users that "Voice data is encrypted and sent to the server only for general learning purposes with your permission." Samsung uses the word "voiceprint." Samsung uses the word "biometric." Samsung asks for permission. Samsung knows what voiceprints are. Samsung knows its voice products process them. Samsung knows that processing requires permission. Samsung says so itself.

3.      But Samsung said nothing to the people whose voices Samsung actually used to build the underlying technology — the broadcast journalists, investigative podcasters, audiobook narrators, voice actors, and incidental

2

speakers whose recordings populate the public audio web. The same Samsung that asked permission of its users did not ask permission of Plaintiffs. Samsung did not tell Plaintiffs their voiceprints were being taken. Not before. Not after. Not now. Samsung did not tell them what was being built with them. Samsung did not ask.

4. Behind that silence, Samsung built a commercial voice-AI business. Samsung's foundational voice synthesis and voice recognition models now power Bixby Voice, the Bixby Custom Voice Creator base model, the Samsung TTS engine, Galaxy AI Live Translate, Interpreter, and Transcript Assist, the speaker-verification systems supporting Hi Bixby wake-word personalization, and the Brain Health voice-biomarker service unveiled at CES 2026 (together, "The Voice Products"). Those models were not built from nothing. They were built on voiceprints, taken from recordings of real human voices, fed into a training pipeline that extracted each speaker's distinctive vocal signature, and used to develop commercial products that ship to the owners of 300+ million Galaxy devices. Samsung's published research describes the pipeline. Samsung's regulatory filings to California acknowledge the corpus. Samsung's acquisitions document the methodology. What Samsung has never described, never acknowledged, and never documented is the consent of the people whose voices made all of it possible. Plaintiffs' voiceprints are among them.

5. The biometric data and the Voice Products are the same thing. The voice characteristics encoded in Samsung's foundational voice models are what

enable those products to function. Samsung extracted the data. Samsung shipped the product.

6.      Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields — Pulitzer winners, Peabody honorees, the recipient of the Order of Lincoln, and audiobook narrators recorded for the major American publishers. None of them was told that their voice was being used to train Samsung's commercial voice AI. None of them was asked. None of them consented.

7.      A voiceprint is a digital fingerprint of the human voice. It is a mathematical representation of the acoustic features — pitch, timbre, resonance — that arise from a person's distinctive physiology, combined with the speech patterns developed over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual and cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice. The biological and behavioral patterns that produced the voiceprint are the same ones used to speak every day.

8.      The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 et seq. ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before a private entity may collect a voiceprint, BIPA requires written notice that biometric data is being

4

collected or stored, written notice of the specific purpose and duration of collection, and a written release executed by the subject. 740 ILCS 14/15(b). Samsung complied with none of these requirements with respect to Plaintiffs or the Class. It did not notify Plaintiffs that their voiceprints were being collected. It did not tell them why. It did not tell them for how long. It did not obtain a written release. It did not develop or publish a retention and destruction policy applicable to the voiceprints it extracted from non-users. Samsung treated the voices of real people as unencumbered raw material for commercial products, without a word to the people whose voices made the products possible, and without permission or compensation.

9. Plaintiffs and the Class have suffered concrete, particularized injuries. Samsung invaded their legally protected privacy interest in their own biometric identifiers by extracting voiceprints and biometric information without notice or consent. Samsung deprived them of the right, guaranteed by BIPA, to make an informed decision about whether a private entity may collect, store, and use their biometric data. Samsung retains their biometric data in its commercial voice models and continues to profit from it. The voiceprints cannot be recovered or replaced. The technology Samsung built using their voices now operates in the markets where they earn their livelihoods — broadcast journalism, audiobook narration, podcast production, voice acting, voiceover work — in a competitive position they neither chose nor authorized.

10. Plaintiffs assert claims under BIPA § 15(a)–(e), the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq. ("IRPA"), the Illinois Consumer Fraud

5

and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq. ("IUDTPA"), and Illinois common law for unjust enrichment.

11.     Plaintiffs seek statutory and actual damages; restitution and disgorgement of the profits Samsung has earned from the commercial exploitation of Plaintiffs' biometric data; classwide injunctive relief including the destruction or retraining of the foundational voice models in which Plaintiffs' voiceprints are encoded; and reasonable attorneys' fees, costs, and expenses.

12.     Samsung promised "AI for All." Samsung delivered AI for some, built on the voiceprints of others. Samsung used the word "voiceprint" when it spoke to its users. Samsung did not use it when it spoke to Plaintiffs, because Samsung did not speak to Plaintiffs at all. Plaintiffs bring this action to recover for that silence, the products built behind it, and the promise Samsung made to everyone but did not keep.

**PARTIES**

13.     Plaintiff Alison Flowers ("Flowers") is a citizen of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound, and whose investigative podcast Somebody was a 2021 Pulitzer Prize finalist for Audio Reporting. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Samsung extracted her voiceprint are described at ¶¶ 77-79, 80-82.

14.     Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a five-decade investigative broadcast journalist whose career has been conducted primarily in Chicago and whose work was recognized in 2025 with the Order of Lincoln, the State of Illinois's highest civilian honor. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Samsung extracted her voiceprint are described at ¶¶ 77-79, 83-85.

15.     Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Samsung extracted his voiceprint are described at ¶¶ 77-79, 86-88.

16.     Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's The City and as Managing Editor of Love + Radio. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Samsung extracted her voiceprint are described at ¶¶ 77-79, 89-91.

17.     Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than 200 audiobooks for major American publishers from her

home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Samsung extracted her voiceprint are described at ¶¶ 77-79, 92-94.

18.    Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist and audio storyteller whose investigative podcast work, including the 2024 Pulitzer Prize–winning You Didn't See Nothin', is produced in Chicago. Lacour's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Samsung extracted his voiceprint are described at ¶¶ 77-79, 95-97.

19.    Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Samsung extracted her voiceprint are described at ¶¶ 77-79, 98-100.

20.    Defendants Samsung Electronics Co., Ltd. ("Samsung Electronics") and Samsung Electronics America, Inc. ("Samsung America") (together, "Samsung") engaged jointly in the conduct alleged in this Complaint. Samsung Electronics conducts the voice-AI research through Samsung Research, its global R&D organization; Samsung Electronics owns the foundational voice models that emerge from that research; and Samsung America deploys those

models to U.S. consumers, including in Illinois, through the Voice Products. Samsung Electronics is directly liable for the conduct alleged in this Complaint. Samsung America is directly liable for its own U.S.-facing conduct. In the alternative, Samsung America acted as Samsung Electronics' agent.

21. Samsung Electronics is a corporation organized under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon, Gyeonggi-do, Republic of Korea. Samsung Electronics is publicly traded on the Korea Exchange. For fiscal year 2025, Samsung Electronics reported consolidated revenue of KRW 333.6 trillion (approximately US$240 billion). The Voice Products are commercial products of the Samsung Electronics enterprise and contribute to its consolidated revenue.

22. Samsung Research is the institutional home of Samsung's voice-AI work and the advanced research and development hub of Samsung Electronics' SET (End-Products) Business. Samsung Research operates a global network of AI Centers and R&D Institutes — including AI Center–Seoul (the flagship), AI Center–Mountain View, AI Center–Toronto, AI Center–Cambridge, AI Center–Warsaw, Samsung R&D Institute India–Bangalore, Samsung R&D Institute Poland, Samsung R&D Institute China–Beijing, and Samsung R&D Institute China–Nanjing — each operated by Samsung Electronics. Samsung Research's voice-AI publications, including the nine-paper series presented at INTERSPEECH 2025, are authored by Samsung Research employees and form the technical foundation of the Voice Products.

23. Samsung Electronics' senior leadership directs the voice-AI work at parent-corporation level. Daniel D. Lee, Executive Vice President of Samsung Electronics, leads Samsung Research's Global AI Center; Daehyun Kim is Executive Vice President of Samsung Research Global AI Center; YoungJip Kim is Executive Vice President and Head of the Artificial Intelligence Team within Samsung's Mobile eXperience Business; and Jisun Park is Corporate Executive Vice President and head of Samsung's Language AI team. Each holds an executive office in Samsung Electronics Co., Ltd. Samsung Electronics has not delegated voice-AI development or commercialization to a subsidiary: the parent develops the technology, publishes the research, owns the foundational models, holds out the Voice Products as Samsung Electronics products, and books the resulting revenue on its consolidated financial statements. Samsung Electronics, through Samsung Research's voice-AI training pipelines and the executive direction of its officers, obtained the voiceprints of Plaintiffs and the Class.

24. Samsung Electronics America is a corporation organized under the laws of the State of New York, with its principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey 07660. Samsung America is a wholly-owned subsidiary of Samsung Electronics and serves as Samsung's principal U.S. operating arm. Samsung America markets, sells, and supports Samsung Galaxy mobile devices, Samsung Smart TVs, home appliances, and other consumer electronics in the United States, including in Illinois. Samsung America also operates Samsung Research America ("SRA"), with its principal

research office in Mountain View, California, which contributes voice-AI research, model development, and product engineering to the foundational voice models at issue.

25. Samsung America is directly liable for its own U.S.-facing conduct. Samsung America (a) sells Galaxy devices to U.S. consumers, including Illinois residents, preloaded with Bixby and Galaxy AI features that depend on Samsung Electronics' foundational voice models — the same models trained on Plaintiffs' voiceprints; (b) operates the U.S.-facing infrastructure through which Bixby voice data, Galaxy AI feature data, and Brain Health voice samples are processed; (c) collects voice data from U.S. users, including Illinois users, pursuant to the U.S. Privacy Policy Samsung America publishes and administers; (d) holds itself out to U.S. consumers as the contracting entity for Samsung consumer electronics in the United States; and (e) earns substantial U.S. revenue from the sale and operation of the Voice Products.

26. In the alternative, Samsung America acted as Samsung Electronics' agent. Samsung Electronics holds Samsung America out, through Samsung's consumer-facing privacy notices, terms of service, product warranties, and corporate disclosures, as Samsung's authorized U.S. operating arm. Samsung America undertook to market, distribute, support, and operate the Voice Products in the United States and to operate Samsung Research America as the U.S. research extension of Samsung Research. Samsung Electronics retains and exercises the right of control through its complete ownership of Samsung America, its control over Samsung America's senior

11

management, and its continuous direction of the voice-AI product development, release, and feature roadmaps that Samsung America executes in the United States. The benefits of Samsung America's U.S. operations are consolidated into Samsung Electronics' financial reporting and flow to Samsung Electronics and its shareholders.

27.     Plaintiffs refer to Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc. collectively as "Samsung" throughout this Complaint. The Samsung Defendants are jointly and severally liable for the conduct alleged in this Complaint.

## JURISDICTION AND VENUE

28.     This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied because Plaintiffs are citizens of Illinois, Defendant Samsung Electronics Co., Ltd. is a citizen of the Republic of Korea, and Defendant Samsung Electronics America, Inc. is a citizen of New York (state of incorporation) and New Jersey (principal place of business). None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

29.     The aggregate amount in controversy substantially exceeds $5,000,000. Plaintiffs seek statutory or actual damages under five distinct BIPA subsections, § 15(a)–(e), on a per-person, per-subsection basis consistent with 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific*

*Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in addition to recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment. On information and belief, Samsung extracted voiceprints and biometric information from voice recordings of hundreds of thousands of individuals whose recordings were produced or recorded in Illinois. The aggregate damages across the proposed Class, together with the injunctive, equitable, and other relief sought, far exceed CAFA's $5,000,000 threshold.

30. This Court has specific personal jurisdiction over Samsung Electronics America under the Illinois long-arm statute, 735 ILCS 5/2-209, and consistent with the Due Process Clause of the Fourteenth Amendment. Samsung America has purposefully directed substantial commercial conduct at Illinois and into this District, and Plaintiffs' claims arise out of and relate to that conduct.

31. Samsung America maintains a continuous, substantial commercial presence in Illinois. Samsung America sells Samsung Galaxy mobile devices, Samsung Smart TVs, home appliances, and the full range of Samsung consumer electronics to Illinois residents through national carrier partners (Verizon, AT&T, T-Mobile) operating throughout Illinois, through major retailers (Best Buy, Costco, Target, Walmart) with Illinois store networks, through Samsung Experience Stores operated within Best Buy locations in this District, and through Samsung America's direct online store at samsung.com/us. Samsung America accepts recurring payments from Illinois subscribers for Samsung services, including Samsung Care+, Samsung Health, Samsung TV

Plus, and Bixby-enabled services. Each Galaxy device, Smart TV, accessory, subscription, and service interaction with an Illinois customer is a separate commercial transaction between Samsung America and an Illinois resident. Samsung America derives substantial revenue from Illinois.

32. Samsung America's Illinois contacts are suit-related. The U.S.-facing Voice Products at issue in this Complaint are deployed by Samsung America to Illinois consumers through the Galaxy devices and other Samsung products Samsung America sells in Illinois. Each Galaxy device sold in Illinois ships with software, controlled by Samsung America, that invokes Samsung's foundational voice synthesis and voice recognition models, which are the models alleged in this Complaint to have been trained on Plaintiffs' voiceprints. Samsung America also collects voice data from Illinois users pursuant to the U.S. Privacy Policy and the consumer-facing privacy notices Samsung America publishes and administers, including the statement that "Voice data is encrypted and sent to the server only for general learning purposes with your permission." On information and belief, the same Bixby system through which Samsung America obtains Illinois users' consent processes Illinois voice data through the foundational voice models at issue.

33. Samsung America was actively defending biometric-privacy litigation in this District (see ¶ 106) at the same time it was deploying to Illinois consumers the very Bixby and Galaxy AI products that depend on the foundational voice models at issue here.

14

34.     This Court has specific personal jurisdiction over Samsung Electronics Co., Ltd. under the Illinois long-arm statute, 735 ILCS 5/2-209. Samsung Electronics' extraction of voiceprints from Illinois-produced recordings and its continuing commercial exploitation of those voiceprints in Illinois are conduct purposefully directed at this State, for the reasons set forth at ¶¶ 68-71, and are independently supported by Samsung Electronics' direction and control of Samsung America's Illinois operations.

35.     Samsung Electronics directs Samsung America's Illinois operations. As alleged at ¶¶ 23, 26, Samsung Electronics retains and exercises control over Samsung America's senior management, voice-AI product development, release schedules, software updates, feature roadmaps, and the commercial deployment of the foundational voice models in Illinois. Samsung America's Illinois contacts are attributable to Samsung Electronics under settled agency principles.

36.     Samsung Electronics' conduct independently satisfies the effects test for specific personal jurisdiction. Samsung Electronics committed intentional acts: the extraction of voiceprints from human voice recordings and the encoding of those voiceprints in commercial voice models. Those acts were expressly aimed at Illinois: Samsung Electronics targeted identifiably Illinois-origin recordings and continues to deliver the resulting commercial products into Illinois. And Samsung Electronics knew, or reasonably should have known, that the brunt of the harm — to Plaintiffs' biometric privacy and commercial identity — would be suffered in Illinois by Illinois residents whose

15

voices, recordings, and professional careers are based here. Samsung Electronics, a publicly traded global corporation with continuous U.S. operations through Samsung America and Samsung Research America, could reasonably anticipate being haled into court in this District for claims arising from its extraction of biometric data from voice recordings produced or recorded in Illinois.

37. The exercise of specific personal jurisdiction over Samsung Electronics in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with due process. Illinois has a strong and particularized interest in providing a forum for redressing the unlawful collection and commercial exploitation of biometric identifiers of persons whose voices were produced or recorded in Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA. 740 ILCS 14/5. Plaintiffs, as Illinois residents whose recordings were produced in Illinois and whose biometric privacy was invaded in Illinois, have a corresponding interest in litigating in their home forum. The burden on Samsung Electronics of litigating in this District is not undue. Samsung Electronics is a publicly traded global corporation that reported approximately US$240 billion in consolidated revenue for fiscal year 2025; conducts continuous U.S. operations through Samsung America; operates Samsung Research America's principal U.S. research office in Mountain View, California; and is an experienced litigant in U.S. federal courts. Samsung Electronics could reasonably anticipate being haled into court in this District for claims arising from its extraction and

commercial exploitation of biometric data sourced from voice recordings produced or recorded in Illinois.

38.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Plaintiffs reside in this District. Plaintiffs' voice recordings were produced and recorded in this District. Samsung's collection, capture, extraction, and commercial exploitation of biometric identifiers belonging to residents of this District occurred without notice, consent, or written release. Samsung sells, distributes, and delivers the voice-AI products built on those biometric identifiers to residents of this District through Samsung America's retail, carrier, and online distribution channels. The economic and privacy injuries Plaintiffs and Class members suffered are felt in this District, where Plaintiffs work, perform, and earn their livelihoods.

39.    Venue is independently proper as to Samsung America under 28 U.S.C. § 1391(b)(1) and § 1391(c)(2), because Samsung America is subject to personal jurisdiction in this District and therefore "resides" in this District for venue purposes.

40.    Venue is independently proper as to Samsung Electronics under 28 U.S.C. § 1391(c)(3), which provides that "a defendant not resident in the United States … may be sued in any judicial district." As a foreign corporation domiciled in the Republic of Korea, Samsung Electronics may be sued in this District regardless of the residency-based venue provisions applicable to domestic defendants.

## FACTUAL BACKGROUND

*Samsung's Voice-AI Business and Its*
*Global Reach into American Voice Content*

41.    Samsung is one of the world's largest consumer electronics companies, with approximately 268,000 employees, more than 230 subsidiaries, and approximately US$21.4 billion in annual research and development spending, the second-highest globally. The Voice Products operate on 300+ million Galaxy devices, including tens of millions in the United States, in over 70 countries and more than 40 languages. To build the foundational voice synthesis and voice recognition models on which the Voice Products depend, Samsung needed voice training data at a corresponding scale — tens of thousands of hours of speech across the languages, accents, recording conditions, and speaking styles Samsung's products must reproduce. English-language audio recorded in the United States was, and is, central to that training base.

42.    Samsung is structurally oriented toward American voice content. Samsung Research operates AI Centers on three continents, including in Mountain View, California. Samsung's voice-AI research is published in English in international venues, including the nine-paper INTERSPEECH 2025 series. Samsung's commercial voice products launched in English alongside Korean — Bixby in May 2017 (Korean) and July 2017 (English); the Bixby Custom Voice Creator in February 2023 (Korean) and August 2023 (English) — and Samsung's largest single market for voice-enabled Galaxy devices is the United States. A Korean parent operating a Mountain View AI center,

18

publishing in English-language venues, selling English-language voice products to American consumers, and competing against U.S. voice-AI providers (Google, Apple, Amazon) is not geographically constrained from accessing English-language American audio. It is structurally compelled to do so.

43. The Voice Products depend on that orientation. Bixby Voice generates and recognizes speech in over twenty languages. The Samsung TTS engine produces broadcast-quality voice output. Galaxy AI Live Translate provides real-time two-way translation between English and twenty-plus other languages. Galaxy AI Interpreter provides split-screen translation for face-to-face conversation. Galaxy AI Transcript Assist provides speaker-separated, summarized transcription. The Bixby Custom Voice Creator clones a user's voice from short on-device samples. The Brain Health voice-biomarker service, unveiled at CES 2026, assesses cognitive health from short voice samples. Each product requires substantial English-language voice training data. Samsung has never disclosed where it got that data.

44. Samsung distributes the Galaxy AI feature suite at no separate charge to users of its Galaxy devices and confirmed in early 2026 that core Galaxy AI features would continue to be offered without a separate subscription. Samsung monetizes voice-AI through device sales, ecosystem lock-in, enterprise mobility licensing, and the related channels alleged below — not through stand-alone subscription fees. Samsung does not geographically restrict the Voice Products' availability in Illinois or any other U.S. jurisdiction.

Each Bixby request, each Live Translate session, each Interpreter conversation, each Transcript Assist generation by an Illinois Galaxy user is a transaction Samsung captures the commercial value of, using voice models trained, on information and belief, on voice recordings Samsung obtained without consent.

*How Samsung's Voice-AI Pipeline*
*Extracts and Encodes Voiceprints*

45. Modern AI voice synthesis and voice recognition technology works by training neural networks on large quantities of recorded human speech. During training, the network learns the acoustic features that make individual voices distinctive — pitch, timbre, resonance, accent, cadence, articulation, phrasing, dynamics, and emotional expression — and encodes those features as mathematical representations stored in the model's parameters. The same parameters are then used to generate new speech that exhibits the acoustic features of the training voices. The technical term of art for these representations is "speaker embedding"; the legal term, under BIPA, is "voiceprint."

46. BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Whether the extracted representations are classified as voiceprints, biometric information derived from voiceprints, or both, they fall within BIPA's scope. The label the technology industry uses does not determine the statutory classification. The function of the data does.

20

47. Samsung Research's published research describes the technical pipeline in detail. Samsung's INTERSPEECH 2025 publications on dysarthric speech synthesis describe voice cloning systems that, with "just a few seconds of audio," "generate speech that mimics a person's voice tone, rhythm, and style."[1] Samsung's INTERSPEECH 2025 publication on robust neural codec language modeling for zero-shot text-to-speech describes the technical mechanism: a target speaker's recording is encoded by a pre-trained neural audio codec into discrete acoustic codes; an autoregressive transformer predicts those acoustic codes conditioned on a phoneme sequence; and the predicted codes are decoded into synthesized speech that reproduces the target speaker's voice from a brief enrollment recording.[2] Samsung Research evaluates the closeness of synthetic speech to reference speakers using speaker-embedding cosine similarity computed via WavLM-based speaker-verification models.[3] Each step in this published technical pipeline extracts

---

[1] Gurugubelli Krishna, "[INTERSPEECH 2025 Series #9] Fairness in Dysarthric Speech Synthesis: Understanding Intrinsic Bias in Dysarthric Speech Cloning using F5-TTS," Samsung Research Blog (Aug. 22, 2025), https://research.samsung.com/blog/-INTERSPEECH-2025-Fairness-in-Dysarthric-Speech-Synthesis-Understanding-Intrinsic-Bias-in-Dysarthric-Speech-Cloning-using-F5-TTS (last visited May 12, 2026); *see also* Anuprabha M., Krishna Gurugubelli & Anil Kumar Vuppala, *Fairness in Dysarthric Speech Synthesis: Understanding Intrinsic Bias in Dysarthric Speech Cloning using F5-TTS*, arXiv:2508.05102 (Aug. 2025), https://arxiv.org/pdf/2508.05102 (last visited on May 12, 2026), Samsung R&D Institute–Bengaluru author affiliation.

[2] Chunhui Lu & Xue Wen, *Robust Neural Codec Language Modeling with Phoneme Position Prediction for Zero-shot TTS,* in Proc. INTERSPEECH 2025, https://www.isca-archive.org/interspeech_2025/lu25e_interspeech.pdf (last visited on May 12, 2026) (Samsung R&D Institute China–Beijing author affiliation); *see also* Chunhui Lu & Xue Wen, *Robust neural codec language modeling with phoneme position prediction for zero-shot TTS*, Samsung Research Blog (Aug. 28, 2025), https://research.samsung.com/blog/Robust-neural-codec-language-modeling-with-phoneme-position-prediction-for-zero-shot-TTS (last visited on May 12, 2026).

[3] Anuprabha M. et al., *supra* note 1.

speaker-specific biometric representations from input audio recordings. Each extraction is, within the meaning of BIPA, the capture of a voiceprint.

48. Samsung's materials describe its voice processing in BIPA's statutory terms. Samsung's U.S. Privacy Policy uses the word "voiceprint" to describe data Samsung's services process, telling users that "certain Services may use your biometric data that is stored on your device" "[e.g., to use] your voiceprint data to create a customized Bixby Voice wake-up command." Samsung's consumer-facing privacy webpage acknowledges that "Voice data is encrypted and sent to the server only for general learning purposes with your permission." Samsung does not use BIPA's vocabulary by accident. Samsung uses it because Samsung's voice systems process the biometric data BIPA's vocabulary describes.

49. The biometric data and the product are the same thing. Bixby's speaker-aware wake-word personalization works because speaker characteristics are encoded in Samsung's models. Live Translate and Interpreter produce natural English voice output because English-language voice characteristics are encoded in Samsung's models. Transcript Assist separates and labels speakers because speaker-distinguishing characteristics are encoded in Samsung's models. The Samsung TTS engine generates broadcast-quality voices because broadcast-quality voice characteristics are encoded in Samsung's models. The Bixby Custom Voice Creator clones a user's voice in seconds because the base model already encodes the acoustic dimensions a human voice can span. The Brain Health voice-biomarker service

22

detects cognitive markers because the model already encodes the baselines against which deviations register. The extraction is not incidental to Samsung's voice products. It is the product.

*Samsung Knows How to Build Consent.*
*Samsung Chose Not To.*

50. Samsung's voice-AI development from 2012 to the present shows a clear pattern: Samsung built consent and protection infrastructure where commercial or reputational incentives demanded it, and not where they did not. The non-user speakers whose voice recordings Samsung ingested to train the foundational voice models fell into the second category.

51. In 2015, Samsung's Smart TV product line transmitted users' living-room speech to a third-party speech-to-text vendor. Samsung's privacy policy warned consumers that the system could capture and transmit conversations. The Electronic Privacy Information Center filed a formal Federal Trade Commission complaint, and public criticism was widespread. Samsung's response — modifying its disclosures, adding in-UI microphone indicators, and emphasizing on-device processing for sensitive voice features — confirms that by 2015 Samsung understood that voice data collection carried biometric-privacy implications. The lesson Samsung learned from the Smart TV episode was applied to user-facing voice features. It was not applied to non-user training data.

52. In July 2017, Samsung acquired Innoetics, a text-to-speech voice synthesis company spun out of the Athena Research and Innovation Center / Institute for Language and Speech Processing in Greece. At acquisition,

23

Innoetics had developed and deployed 29 synthetic voices across 15 languages, and its signature commercial capability was a voice-to-speech technology that could mimic a target speaker's voice after training on the speaker's recordings. Samsung integrated the Innoetics team into Samsung Electronics Greece, where Innoetics co-founder Aimilios Chalamandaris currently serves as Head of R&D.

53.     Innoetics's published methodology, three years before Samsung acquired it, was the use of publicly available audiobook recordings as training material for synthetic-voice creation. In *Using Audio Books for Training a Text-to-Speech System*, Proc. LREC 2014, the Innoetics founders described an automated pipeline for converting publicly available audiobook recordings into a spoken corpus for unit-selection text-to-speech synthesis. The paper characterized "[u]sing publicly available audiobooks as the raw material of a spoken corpus for such systems" as "creat[ing] new perspectives regarding the possibility of creating new synthetic voices quickly and with limited effort."[4] The Innoetics acquisition gave Samsung in-house voice-cloning intellectual property, a multilingual TTS engineering team, and a documented institutional

---

[4] Aimilios Chalamandaris, Pirros Tsiakoulis, Sotiris Karabetsos & Spyros Raptis, *Using Audio Books for Training a Text-to-Speech System*, in *Proceedings of the Ninth International Conference on Language Resources and Evaluation (LREC 2014)* 3076–80, http://www.lrec-conf.org/proceedings/lrec2014/pdf/838_Paper.pdf (last visited May 13, 2026). All four authors were affiliated with Innoetics Ltd. The training corpus consisted of 21 commercially produced audiobooks totaling "over 140 hours" of speech, "all recorded by a professional American English native female speaker," pruned to a 97-hour synthetic-voice training corpus drawn from that single narrator's recordings. *Id.* at 3077 & Table 1. The paper does not name the narrator, does not address speaker consent, and does not describe any mechanism by which she authorized the use of her commercial recordings as training feedstock.

methodology for treating publicly available audiobook recordings as synthetic-voice training feedstock. On information and belief, Samsung's foundational voice models carry forward that methodology, adopted by acquisition and developed thereafter without disclosed consent from the narrators whose recordings constitute the methodology's raw material.

54. In March 2017, Samsung announced Bixby, which launched in Korean in May 2017 and English in July 2017. Throughout the period in which Samsung built and trained Bixby's underlying foundation models, Samsung obtained no notice, consent, or written release from non-users whose voice recordings Samsung ingested into its training pipelines. In November 2018, Samsung opened Bixby to third-party developers, expanding the surface area for commercial deployment of the underlying voice models without changing the consent posture for the speakers whose voices trained those models. At CES 2020, Samsung's STAR Labs subsidiary publicly debuted Neon, an "artificial human" platform purportedly capable of generating realistic human-like virtual beings. Samsung was pursuing artificial human voice and likeness reproduction at the same time it was, on information and belief, training the foundation models on real human voices taken without consent.

55. On February 22, 2023, Samsung announced the Bixby Custom Voice Creator: "Using the new Bixby Custom Voice Creator, users can record different sentences for Bixby to analyze and create an AI generated copy of their voice and tone." The product is explicitly designed around speaker consent: the user records prompted sentences on-device, the user authorizes

25

the cloning, the user retains the resulting voice for personal use. The product confirms that Samsung's organization — the same Samsung Research engineering team, the same Samsung legal department — is fully capable of designing voice-cloning workflows around informed, opt-in consent. Samsung built that infrastructure for the user's own voice. Samsung did not build it for the voices on which Samsung's foundational voice models were trained.

56.    On November 8, 2023, Samsung introduced Samsung Gauss, its proprietary generative AI suite, at the Samsung AI Forum. Samsung publicly represented that the Gauss Image model "was learned from safe data that does not infringe on licenses or personal information." Samsung made no comparable representation about its voice synthesis or voice recognition models — not for Gauss, not for Gauss2 in 2024, not since. If Samsung's voice models had been trained on safely sourced data, Samsung would have said so. Samsung has not.

57.    On January 17, 2024, Samsung launched the Galaxy S24 series and introduced Galaxy AI. Samsung also introduced visible watermarks on AI-edited images, a measure addressing the consumer-deception and provenance risks of generative image AI. Samsung built no corresponding measure for voice content generated by foundational models built on non-consenting speakers' voiceprints. The pattern repeats: when commercial or reputational incentives push Samsung to address an AI risk, Samsung addresses it. Voice training-data provenance did not push.

58. At CES in January 2026, Samsung unveiled the Brain Health voice-biomarker service. The product uses voice analysis as a diagnostic biomarker for cognitive decline — Samsung's institutional confirmation that voice is a biologically meaningful identifier of individual condition and identity. On March 31, 2026, Samsung disclosed that Bixby had transitioned to an LLM-powered "callable agents" architecture resting on the same foundational voice-AI models trained on the data at issue here. Samsung's commercial use of Plaintiffs' biometric data is not historical. It is ongoing.

*Samsung's Training-Data Acquisition Practices*

59. Samsung has never publicly disclosed the sources, scale, or provenance of the voice training data behind its foundational voice synthesis and voice recognition models. Samsung has not published a model card, a data sheet, a training-data manifest, or any transparency report identifying what voice recordings it used, where it obtained them, or whether any of the speakers consented. The disclosure absence covers every Voice Product.

60. The only voice-training data Samsung Research has publicly identified appears in its peer-reviewed publications, and the disclosures are partial. These admissions are Samsung's own, published under Samsung Research's institutional banner, attributed to Samsung Electronics employees, and reflecting the same enterprise of generative AI Samsung disclosed to California regulators under AB 2013 (see ¶ 62). In its 2019 publication "End-to-End Training of a Large Vocabulary End-to-End Speech Recognition System," arXiv:1912.11040, Samsung Research disclosed training and

27

evaluating its Bixby ASR system on the LibriSpeech corpus and on a "10,000-hour anonymized Bixby English dataset."[5] In its 2021 submission to the VoxCeleb Speaker Recognition Challenge, arXiv:2109.13518, Samsung Research America's North America Bixby Lab disclosed evaluating its speaker-diarization system on the VoxConverse dataset, which Samsung Research itself described as "natural conversations of multiple talkers collected from YouTube."[6] In its 2022 publication "SOMOS: The Samsung Open MOS Dataset," arXiv:2204.03040, Samsung Research disclosed building a 20,000-utterance MOS dataset on the LJ Speech voice, a public-domain LibriVox-derived corpus.[7] In its 2025 INTERSPEECH publication on multi-task Korean

---

[5] Chanwoo Kim, Sungsoo Kim, Kwangyoun Kim, Mehul Kumar, Jiyeon Kim, Kyungmin Lee, Changwoo Han, Abhinav Garg, Eunhyang Kim, Minkyoo Shin, Shatrughan Singh, Larry Heck & Dhananjaya Gowda, *End-to-End Training of a Large Vocabulary End-to-End Speech Recognition System*, arXiv:1912.11040 (Dec. 23, 2019), https://arxiv.org/abs/1912.11040 (last visited May 13, 2026). The paper states: "We evaluated the effectiveness of our system on the standard Librispeech corpus and the 10,000-hr anonymized Bixby English dataset." *Id.* at Abstract. Author Chanwoo Kim was Corporate Executive Vice President at Samsung Research and Head of the Language and Voice Team through 2023; author Larry Heck previously led Google Assistant and Microsoft Cortana before joining Samsung Research.

[6] Myungjong Kim, Taeyeon Ki, Aviral Anshu & Vijendra Raj Apsingekar, *North America Bixby Speaker Diarization System for the VoxCeleb Speaker Recognition Challenge 2021*, arXiv:2109.13518 (Sept. 28, 2021), https://arxiv.org/abs/2109.13518 (last visited May 13, 2026). The paper states: "This paper describes the submission to the speaker diarization track of VoxCeleb Speaker Recognition Challenge 2021 done by North America Bixby Lab of Samsung Research America. . . . We evaluated our system on the VoxConverse dataset and the challenge evaluation set, which contain natural conversations of multiple talkers collected from YouTube." *Id.* at Abstract.

[7] Georgia Maniati, Alexandra Vioni, Nikolaos Ellinas, Karolos Nikitaras, Konstantinos Klapsas, June Sig Sung, Gunu Jho, Aimilios Chalamandaris & Pirros Tsiakoulis, *SOMOS: The Samsung Open MOS Dataset for the Evaluation of Neural Text-to-Speech Synthesis*, arXiv:2204.03040 (Apr. 6, 2022, last revised Aug. 24, 2022), https://arxiv.org/abs/2204.03040 (last visited May 13, 2026); presented at INTERSPEECH 2022. The paper states: "[The dataset] consists of 20K synthetic utterances of the LJ Speech voice, a public domain speech dataset which is a common benchmark for building neural acoustic models and vocoders. . . . We collect MOS naturalness evaluations on 3 English Amazon Mechanical Turk locales." *Id.* at Abstract. Authors Chalamandaris and Tsiakoulis are co-founders of Innoetics, the TTS company Samsung acquired in 2017, *see* ¶¶ 52-53; Chalamandaris currently serves as Head of R&D at

speech-to-text modeling, Samsung Research disclosed training on 40,000 hours of Korean speech drawn from ten enumerated AIHub corpora, including broadcast-content dialogue voice recognition, broadcast news anchor voice data, conference voice data, and other archival sources.[8] In its 2025 INTERSPEECH publication on streaming TTS in a Mamba framework, Samsung Research disclosed training and evaluating its zero-shot text-to-speech acoustic model on the LibriTTS corpus — 585 hours of audiobook narration derived from the LibriVox project, used across all three training subsets (train-clean-100, train-clean-360, and train-other-500).[9] In its 2025 INTERSPEECH publication on speech emotion recognition, Samsung Research

---

Samsung Electronics Greece.

[8] Samsung Research Blog, *[INTERSPEECH 2025] Beyond Hard Sharing: Efficient Multi-Task Speech-to-Text Modeling with Supervised Mixture of Experts*, https://research.samsung.com/blog/-INTERSPEECH-2025-Beyond-Hard-Sharing-Efficient-Multi-Task-Speech-to-Text-Modeling-with-Supervised-Mixture-of-Experts (last visited May 13, 2026). The blog post describes training on 40,000 hours of Korean speech from the AIHub corpus and enumerates the specific AIHub dataset identifiers used: Korean voice data (dataSetSn=123), broadcast-content dialogue voice recognition (463), Korean-language college lecture data (71627), conference voice data (132), broadcasting Korean-European and Korean-English interpretation/translation voice (71384 and 71379), conference voice recognition by major area (464), noise-environment voice recognition (568), news script and anchor voice (71557), and Korean-English mixed recognition (71260). AIHub (https://aihub.or.kr) is the open-data platform operated by the National Information Society Agency (NIA) under the Republic of Korea's Ministry of Science and ICT.

[9] Samsung Research Blog, *[INTERSPEECH 2025] Efficient Streaming TTS Acoustic Model with Depthwise RVQ Decoding Strategies in a Mamba Framework*, https://research.samsung.com/blog/-INTERSPEECH-2025-Efficient-Streaming-TTS-Acoustic-Model-with-Depthwise-RVQ-Decoding-Strategies-in-a-Mamba-Framework (last visited May 13, 2026). The publication states: "We conducted comprehensive evaluations on the LibriTTS dataset under strict zero-shot conditions. . . . [W]e used all of the training subsets (train-clean-100, train-clean-360, train-other-500) for training and the test-clean subset for evaluation." The LibriTTS corpus, comprising approximately 585 hours of speech at 24 kHz from approximately 2,456 speakers, is derived from the LibriVox audiobook project and Project Gutenberg texts. *See* Heiga Zen et al., *LibriTTS: A Corpus Derived from LibriSpeech for Text-to-Speech*, arXiv:1904.02882 (Apr. 5, 2019), https://arxiv.org/abs/1904.02882 (last visited May 13, 2026).

disclosed training on the MSP-Podcast corpus, 119,421 samples drawn from commercially distributed podcast recordings, labeled through Amazon Mechanical Turk crowdsourcing.[10]

61. The corpora Samsung has admitted using cannot account for the foundational voice models Samsung deploys today. LibriTTS consists of 585 hours of English-only audiobook narration from approximately 2,456 LibriVox volunteer narrators reading public-domain texts from Project Gutenberg. LibriTTS contains no Korean, no Spanish, no French, no Mandarin, no Arabic, no Hindi, and none of the more than twenty other languages Samsung's voice products generate. LibriTTS contains no Levantine Arabic accent of the kind Plaintiff Nassif provides as a professional asset; no podcast-style narrative delivery of the kind Plaintiffs Flowers, Amer, and Lacour produce; no broadcast-journalism delivery of the kind Plaintiffs Marin and Rogers anchored across four and five decades of on-air work; and no contemporary commercially produced audiobook narration of the kind Plaintiffs Dorcus and Nassif record for the major American publishers. The LibriVox volunteers who recorded LibriTTS did not consent to extraction of their voiceprints for commercial voice-AI; were not informed by Samsung of any such use; and were not paid for it. And the 585 hours of LibriTTS, the 24 hours of LJ Speech, the 119,421 podcast samples of MSP-Podcast, and the 40,000 hours of Korean AIHub data cannot produce the multilingual, accent-diverse, broadcast-quality voice

---

[10] Samsung Research Blog, *Multi-task Learning for Speech Emotion Recognition in Naturalistic Conditions*, https://research.samsung.com/blog/Multi-task-Learning-for-Speech-Emotion-Recognition-in-Naturalistic-Conditions (last visited May 13, 2026).

capability Samsung sells across 300+ million Galaxy devices. On information and belief, Samsung's foundational voice training corpora aggregate to tens of thousands of additional hours of speech from tens of thousands of additional speakers, sourced through pathways Samsung has not publicly identified.

62. On January 1, 2026, Samsung published the disclosure required by California's Generative Artificial Intelligence Training Data Transparency Act, Cal. Bus. & Prof. Code §§ 22757–22757.4 (AB 2013). Samsung admitted that it trains its generative AI on three categories of data: "publicly available data," defined as "open-source materials and publicly accessible information"; "licensed/purchased data," defined as "content acquired through agreements with third-party providers"; and "synthetic data." Samsung admitted that its training corpus comprises "approximately 1 trillion data points," that "[t]he datasets may include data subject to copyright, trademark, or patent protection," that the datasets may contain "personal information" within the meaning of the California Consumer Privacy Act, and that "[t]he datasets were first used in 2023 during the development phase of Samsung's generative AI systems and services." Samsung did not identify a single specific dataset, name a single licensor, or describe any consent mechanism applicable to the speakers whose voices populate the "publicly available" and "licensed/purchased" categories.[11] The AB 2013 disclosure governs the same enterprise of generative-AI systems on which every Voice Product operates. It is

---

[11] https://www.samsung.com/us/ai-products/generative-ai-training-data-summary/ (last visited on May 13, 2026).

Samsung's first and only regulatory-level acknowledgment of how its generative AI is trained — and it confirms three propositions at the heart of this Complaint: (a) Samsung's generative AI is trained on a vast corpus of publicly available and third-party-licensed content; (b) the training corpus contains personal information; and (c) Samsung has not obtained, and does not contend it has obtained, the informed written consent of the persons whose biometric information is contained in that corpus.

63. The unidentified portion of Samsung's training corpus, on information and belief, was sourced through three convergent pathways. First, Samsung ingested industry-standard public speech corpora derived from identifiable, attributed recordings: the audiobook category (LibriSpeech, LibriTTS, LibriTTS-R, Libri-Light, Multilingual LibriSpeech, LJ Speech), the YouTube category (VoxCeleb, VoxCeleb2, VoxConverse, YODAS, YODAS2, YouTube-Commons, GigaSpeech), the crowdsourced-voice category (Mozilla Common Voice), the podcast category (MSP-Podcast, GigaSpeech in part), and the broadcast-conversation category (AIHub broadcast corpora). Each of these datasets aggregates the recordings of identifiable human speakers, indexed in publicly available metadata to the original platform, channel, broadcaster, narrator, or speaker. Samsung Research has publicly admitted using at least LibriSpeech, LibriTTS, LJ Speech, VoxConverse, MSP-Podcast, and the AIHub Korean broadcast and news corpora. Second, on information and belief, Samsung directly accessed identifiable, attributed audio content on publicly accessible platforms — YouTube, podcast directories (Apple Podcasts, Spotify,

iHeartRadio), audiobook platforms (Audible, Apple Books, Libro.fm, Scribd/Everand), broadcast archives (NBC 5 Chicago, WTTW, Media Burn), and streaming services. These platforms display creator profiles with name, geographic location, and content catalog visible at the time of acquisition. Third, on information and belief, Samsung obtained voice recordings through commercial licensed-data arrangements characterized in Samsung's AB 2013 disclosure as "data licensed or purchased from third parties," and through synthetic augmentation using voice cloning as alleged below.

64. No commercial license or third-party purchase, however structured, can supply the consent BIPA requires. BIPA § 15(b) requires that the private entity collecting biometric data first inform "the subject" in writing of the collection and its purpose and duration, and obtain a written release executed by "the subject" or the subject's "legally authorized representative." 740 ILCS 14/15(b). The statutory duty runs to the individual whose voiceprint is to be extracted. It is non-delegable. No copyright holder, distribution platform, audiobook publisher, podcast network, broadcast employer, recording aggregator, or data vendor can give consent on the speaker's behalf. A license from a copyright owner conveys copyright rights, not biometric-privacy rights. A platform's terms of service may bind the platform's users; they do not bind speakers whose voices appear in content uploaded by others. A data vendor's representations about the lawfulness of its corpus may shift contractual risk among commercial parties; they do not satisfy BIPA's notice and written-release requirements as to the individual speakers from whose

33

recordings biometric data is extracted. The biometric-consent duty is owed to the speaker. Only the speaker can perform it. BIPA-compliant collection would have required Samsung to identify each source speaker, provide written notice of the specific purpose and duration of collection, and obtain a written release before ingesting the recording — a compliance burden Samsung has nowhere alleged to have performed.

65. Samsung's institutional approach is documented in the contemporaneous work of Samsung Research's external research partnerships. Samsung Research's 2024 collaboration with Adam Mickiewicz University and Samsung R&D Institute Poland — *Spoken Language Corpora Augmentation with Domain-Specific Voice-Cloned Speech*, arXiv:2406.07090, under the Samsung-funded CAIMAC project — describes the use of VALL-E X voice cloning to expand speech-recognition training corpora through synthesized speech generated from existing speaker recordings. Samsung uses voice cloning to multiply the training value of voice recordings Samsung has already obtained. The voices Samsung clones to expand its corpora are voices Samsung obtained without consent in the first place.

66. No publicly documented mechanism exists for non-user speakers to opt out of or request removal from Samsung's training datasets or models. Samsung's privacy disclosures are directed at users of its devices and services. They do not address, and cannot provide notice or consent on behalf of, the non-users from whose third-party-sourced recordings Samsung extracted biometric data.

67.     On information and belief, Samsung's foundational voice models were trained on voice recordings obtained without the knowledge or consent of the speakers, including Plaintiffs' and Class members' recordings. The bases for this allegation include Samsung's partial dataset disclosures in its published research; the arithmetic inadequacy of those disclosed corpora to produce Samsung's deployed multilingual voice products; Samsung's regulatory admission under AB 2013 of training on publicly available and third-party-licensed data; Samsung's three-pathway acquisition through public corpora, direct platform access, and commercial licensed-data arrangements; Samsung's contemporaneous funding of voice-cloning data augmentation; the disjunction between Samsung's "safe data" claim for Gauss Image and its silence as to voice; and Samsung's failure to provide any mechanism by which non-users can discover or opt out of inclusion. This conclusion is reinforced by the industry-wide pattern alleged in *Kogon v. Google LLC*, No. 1:26-cv-02582 (N.D. Ill.); *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del.); *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y.); *Basich v. Microsoft Corp.*, No. 2:26-cv-00163 (W.D. Wash.); and *Cruz v. Fireflies.AI Corp.*, No. 1:25-cv-13783 (N.D. Ill.), in which voice-AI defendants in Samsung's product market are alleged to have built commercial voice products on voice recordings ingested without speaker consent.

*The Biometric Data Was Generated in Illinois*

68.     Plaintiffs' and Class members' biometric data is Illinois-origin biometric data on three independent grounds. *First*, the biometric data was

35

generated in Illinois. Plaintiffs' and Class members' voices were produced while physically present in Illinois. The audio encodings were created in Illinois — in Chicago broadcast studios, recording facilities, home recording studios, podcast production studios, theatrical venues, and other Illinois locations — and published from Illinois to publicly accessible platforms. The voice itself originated in Illinois; the audio embodiment was created in Illinois; the voiceprint Samsung extracted is a derivative of Illinois-origin biometric material. Samsung's ingestion of those recordings necessarily involved acquiring Illinois-origin biometric data, regardless of the physical location of the servers on which Samsung's training pipeline operated.

69. *Second*, Samsung's acquisition targeted identifiably Illinois-origin material. As alleged at ¶ 63, Samsung sourced training data from publicly accessible platforms that display speaker metadata identifying the speaker by name and the geographic origin of the content. Plaintiffs' and Class members' Illinois identities and recording locations were publicly visible on the platforms from which, on information and belief, Samsung obtained their recordings — including YouTube, broadcast archives (NBC 5 Chicago, WTTW, Media Burn), podcast directories (Apple Podcasts, Spotify, iHeartRadio), and audiobook platforms (Audible, Apple Books). Samsung's acquisition was not the passive receipt of an anonymized dataset; it involved the affirmative acquisition of recordings whose Illinois origin and identifiable Illinois speakers were apparent to Samsung at the time of acquisition.

70. *Third,* Samsung's ongoing commercial exploitation of the resulting voice models is directed at Illinois continuously. The Voice Products are preinstalled on Galaxy devices sold in Illinois and continuously operated for Illinois consumers. The voice characteristics encoded in Samsung's foundational voice models, including, on information and belief, voiceprints derived from Plaintiffs' and Class members' Illinois-produced recordings, are continuously deployed to and operated for Illinois consumers each time those consumers use a Voice Product.

71. Each ground independently anchors Samsung's liability to Illinois. BIPA's consent obligation under § 15(b) is a duty that runs to "the subject." 740 ILCS 14/15(b). Plaintiffs and Class members were and are in Illinois. The duty to inform and obtain consent was owed to Illinois persons. The failure to perform that duty is an omission with respect to Illinois persons, localized where those persons reside and where their voices were produced. Samsung's ongoing possession of those voiceprints is a continuing § 15(a) obligation; Samsung's commercial exploitation under § 15(c) is the monetization of Illinois-origin biometric assets belonging to Illinois persons.

*Samsung Monetizes the Voice Models*
*Through an Integrated Commercial Chain*

72. Samsung monetizes the foundational voice models through an integrated commercial chain comprising at least six channels: (a) Galaxy mobile device sales — phones, tablets, watches, and earbuds — to which the Galaxy AI feature suite and Bixby Voice are bundled as ecosystem features; (b) Smart TVs, home appliances, and automotive systems incorporating

Samsung's voice capabilities; (c) enterprise mobility licensing and Samsung Knox–related enterprise services for Fortune 500 companies, hospitals, universities, and government agencies operating in Illinois; (d) the Samsung TTS engine, licensed across Samsung's product ecosystem and to third-party platforms; (e) the Brain Health voice-biomarker service unveiled at CES 2026; and (f) strategic deployment value across Samsung's broader product portfolio and developer ecosystem, including arrangements with third-party AI providers (Google's Gemini and Perplexity AI for cloud-based Galaxy AI processing) that themselves rely on Samsung's voice-processing infrastructure.

73. Each channel depends on the foundational voice models. The voice quality, expressiveness, multilingual capability, speaker-aware transcription, real-time translation, voice-cloning capability, and voice-biomarker functionality Samsung sells exist, on information and belief, because Samsung extracted biometric characteristics from training recordings, including, on information and belief, the recordings of Plaintiffs and Class members. The Illinois-directed commercial activity at the downstream end is the monetization of the biometric extraction at the upstream beginning.

*Samsung Disseminates Class Members' Voiceprints*
*Across Its Corporate and Cloud Infrastructure*

74. Samsung's foundational voice models, and the voiceprints encoded in those models' parameters, are disseminated across Samsung's global corporate and cloud infrastructure. The voice models are operated by Samsung Electronics and its global subsidiaries and AI Centers and deployed to consumers and enterprise customers through Samsung Electronics America

and Samsung's other regional operating subsidiaries. Samsung's U.S. Data Privacy Framework Consumer Privacy Policy reflects ongoing cross-affiliate data sharing across Samsung's global affiliate network, including the United States, the Republic of Korea, Poland, India, China, the United Kingdom, and Canada. On information and belief, Samsung shares voice data — including voiceprints derived from Plaintiffs' and Class members' recordings — with affiliates, vendors, and service providers across these jurisdictions in the ordinary course of Samsung's voice-AI development, training, evaluation, and commercial deployment.

75. Samsung's Galaxy AI relies, for cloud-based features, on third-party AI providers including Google's Gemini and Perplexity AI. On information and belief, Samsung's cloud-based voice-processing arrangements with those providers involve transmitting Samsung-extracted voice data to third-party infrastructure. Samsung's terms of service additionally claim broad sub-licensable rights to data Samsung uses to develop its products, permitting Samsung to disseminate biometric information derived from Class members' recordings to an indefinite chain of recipients without the specific consent that BIPA § 15(d) requires.

76. No enumerated exception under § 15(d) authorizes Samsung's dissemination. Plaintiffs and Class members did not consent; no financial transaction or fraud investigation triggered the disclosure; no court order or law authorized it. Samsung's dissemination is, on information and belief, a continuing classwide violation of § 15(d).

*Named Plaintiffs*

*Allegations Common to Each Named Plaintiff*

77.     On information and belief, the voice recordings of each named Plaintiff were among the audio that Samsung ingested to train its foundational voice synthesis and voice recognition models, and voiceprints derived from those recordings are encoded in the parameters of those models and reproduced in the audio those models generate. Each Plaintiff's catalog of professional voice work matches the profile of training audio Samsung's technical documentation identifies as optimal: long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source, and continuously available on the publicly distributed audio platforms — broadcast archives, podcast directories, audiobook platforms, video platforms — from which Samsung, on information and belief, sourced training data. Each platform on which a Plaintiff's catalog is publicly accessible carries metadata explicitly identifying the Plaintiff by name and Illinois as the production location, so Samsung's acquisition could not have been the passive receipt of an anonymized dataset and necessarily involved acquiring biometric data tied to an identified Illinois speaker producing work in Illinois.

78.     No named Plaintiff created a Samsung Account authorizing Samsung to use his or her voice, uploaded a voice recording to any Samsung platform for that purpose, invoked any Samsung voice-AI product, or accepted any Samsung terms of service related to its voice products. No Plaintiff received notice that Samsung had collected his or her voiceprint, received any

disclosure of the purpose or duration of that collection, or executed a written release. Samsung's collection of each Plaintiff's voiceprint, and Samsung's continuing possession and commercial exploitation of that voiceprint, occurred and continues without that Plaintiff's knowledge or consent. The records identifying which specific voice recordings Samsung ingested are within Samsung's exclusive control.

79. The injury Samsung inflicted on each named Plaintiff is concrete and particular and shares the same structure across all of them. Samsung extracted each Plaintiff's voiceprint from recordings the Plaintiff produced in Illinois, encoded that voiceprint in foundational voice models, and continues to profit from those models and the Voice Products built on them. The voiceprint cannot be recovered or replaced; it is the same biological and behavioral signature the Plaintiff uses to speak. The Voice Products now operate in the same professional voice markets in which the Plaintiff built and continues to build a career, in a competitive position the Plaintiff neither chose nor authorized.

*Alison Flowers*

80. Plaintiff Flowers is an investigative journalist, podcast producer, and audio storyteller based in Chicago. She is the founder of Spiralbound, a production company operating at the intersection of investigative journalism and immersive storytelling. Before founding Spiralbound, Flowers served as Head of Production at the Invisible Institute, a nonprofit investigative journalism organization based on the South Side of Chicago. Flowers is best

known as the producer and reporter of *Somebody*, the seven-part investigative podcast that investigated the 2016 murder of Courtney Copeland in Chicago. *Somebody* was a 2021 Pulitzer Prize finalist for Audio Reporting; won the National Magazine Award (Ellie) for Podcasting, the Scripps Howard Award, the International Documentary Association's Best Audio Documentary, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival Award for Best Serialized Story; topped Rolling Stone's "Best Podcasts of 2020" list; was ranked first on The New York Times' list of true-crime podcasts at the intersection of race; and ranked second on The Atlantic's "50 Best Podcasts of 2020." Flowers also co-produced the 2019 SHOWTIME documentary *16 Shots*, examining the police killing of Laquan McDonald in Chicago, which won the Emmy Award for Outstanding Investigative Documentary. All of Flowers's voice work was produced in Illinois. *See* ¶¶ 68-71.

81.     *Somebody* and Flowers's other audio reporting are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Stitcher, and other major podcast and digital-audio platforms, with metadata identifying Flowers as the producer and on-air journalist and Chicago as the production location. Flowers's additional audio reporting on Reveal (from the Center for Investigative Reporting), The Heist (from the Center for Public Integrity), Vox, Dateline NBC, and Democracy Now! is likewise continuously available on those programs' respective platforms. *Somebody* was also distributed through Google Podcasts before Google's discontinuation of that service in 2024. Flowers's

42

body of audio work has been continuously available across these channels for years preceding Samsung's training of the foundational voice synthesis and voice recognition models alleged in this Complaint. *Somebody*'s recognition — Pulitzer finalist, National Magazine Award, top-of-list rankings in Rolling Stone, The New York Times, and The Atlantic — would have made Flowers's recordings high-value and readily identifiable source material for voice-model training.

82. Flowers's injury is concrete and particular to her in the manner alleged at ¶ 79. Flowers continues to produce investigative audio journalism through Spiralbound. The long-form audio markets in which she earns her livelihood — investigative podcast journalism, narrative audio documentary — are precisely the markets that Samsung TTS and Bixby Voice are designed to serve at substantially lower cost than the human production Flowers provides. Samsung TTS and Bixby Voice generate podcast-style narrative voice content competing with Flowers's on-air narration in *Somebody* and her other investigative podcast work. The Bixby Custom Voice Creator base model can be deployed by Samsung's downstream users to generate voice outputs trained on the same foundational models that ingested Flowers's voice, extending the unauthorized commercial use of her voiceprint into derivative outputs the Samsung product ecosystem enables. The technology Samsung built using Flowers's voiceprint now competes with Flowers in her own active market.

43

*Carol Marin*

83.     Plaintiff Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago. Her on-air work has aired on WMAQ-TV (NBC 5 Chicago), CBS News (*60 Minutes, 60 Minutes II*, the *CBS Evening News*), WTTW (*Chicago Tonight*), CNN, and the Discovery Channel, and encompasses television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing. Marin has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, and the Sigma Delta Chi Ethics in Journalism Award, and has been inducted into the Chicago Journalism Hall of Fame. In 2025, the Governor of Illinois designated Marin a Lincoln Laureate and conferred upon her the Order of Lincoln, the State of Illinois's highest civilian honor. All of Marin's voice work relevant in this case was produced in Illinois. *See* ¶¶ 68-71.

84.     Marin's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio produced over five decades of professional work. Substantial portions of that catalog are continuously and publicly available through the Media Burn Independent Video Archive (mediaburn.org), a Chicago-based nonprofit archive that preserves Marin's broadcast investigative reporting and documentary work; through the WTTW digital archive at news.wttw.com; through the NBC 5 Chicago digital archive at nbcchicago.com;

and on YouTube, where Marin's Peabody acceptance speeches, debate moderation, archived broadcast segments, and career retrospectives are publicly accessible. Each platform displays metadata identifying Marin, the producing program, the date of recording, and Chicago as the production location. The five-decade duration and cross-platform breadth of Marin's catalog supplies an unusually large and consistent single-speaker corpus from one identifiable Illinois speaker.

85.    Marin's injury is concrete and particular to her in the manner alleged at ¶ 79. The broadcast and investigative journalism markets in which Marin built her five-decade career — television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing — are the markets in which Samsung's voice synthesis products now operate. Samsung TTS and Bixby Voice generate broadcast-quality voice content competing with Marin's on-air anchoring, debate moderation, and documentary narration. Galaxy AI Transcript Assist automates speaker-separated transcription of recorded interviews — a step in the investigative newsgathering workflow central to Marin's career — reducing the production cost of competing voice-AI products built on the same foundational models. And Samsung's Brain Health voice-biomarker service repurposes recorded human voice as input to a Samsung-commercialized diagnostic product, an additional unauthorized commercial use particularly pointed for a journalist whose recorded broadcast catalog spans five decades and is preserved in archival form for that exact reason.

45

*Philip Rogers*

86.     Plaintiff Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS Radio's all-news station in Chicago) and WMAQ-TV (NBC 5 Chicago). His on-air work spans radio reporting at WBBM Newsradio, television reporting and anchoring at WMAQ-TV, and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, mass shootings, corruption trials, and major national and international events. Rogers has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, and multiple Peter Lisagor Awards from the Chicago Headline Club. All of Rogers's voice work was produced in Illinois. *See* ¶¶ 68-71.

87.     Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio in both radio and television formats. Substantial portions of that catalog are continuously and publicly available through the NBC 5 Chicago digital archive at nbcchicago.com, where Rogers's on-air reports, investigative segments, and broadcast news stories are archived and searchable with metadata identifying Rogers, the producing program, the date of broadcast, and Chicago as the location of production; and on YouTube, where Rogers's on-air work is publicly accessible, including a career-retrospective interview produced by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting from Chicago. The cross-platform breadth of his catalog — four decades of single-speaker

professional broadcasting across both radio and television, from one identifiable Illinois speaker — represents a category of source material particularly valuable for voice synthesis training.

88. Rogers's injury is concrete and particular to him in the manner alleged at ¶ 79. The broadcast radio and television markets in which Rogers built his career are the markets in which Samsung's Samsung TTS engine, Bixby Voice, Galaxy AI Live Translate, and Interpreter now operate. Samsung TTS and Bixby Voice generate broadcast-quality voice content competing with the on-air radio and television voice work that defined Rogers's career. Galaxy AI Transcript Assist automates speaker-separated transcription of recorded interviews — a step in the broadcast newsgathering workflow Rogers performed throughout his career — reducing the production cost of competing voice-AI products built on the same foundational models. And Samsung's Brain Health voice-biomarker service, unveiled at CES 2026, is a separate and pointed harm for a journalist whose recorded broadcast catalog spans four decades and is preserved in archival form for that exact reason: Samsung's commercial repurposing of that catalog as input to a diagnostic product is an unauthorized commercial use of the same voice Rogers spent his career placing in the public broadcast record.

*Robin Amer*

89. Plaintiff Amer is an investigative journalist, audio producer, podcast creator, and on-air host with more than twenty years of experience in digital, broadcast, and print media. Amer holds an undergraduate degree from

Brown University and a Master's degree from the Medill School of Journalism at Northwestern University. After Medill, Amer served as an investigative reporting fellow at Medill Watchdog, contributing to a yearlong collaboration with the *Chicago Tribune* that was a finalist for the Pulitzer Prize. Amer is the creator, host, narrator, and showrunner of *The City*, USA Today's investigative podcast, which in Season 1 peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by *The New Yorker, The New York Times, Quartz,* and Apple Podcasts. Amer subsequently served as Senior Producer for Audio Features at *The Washington Post*, where she edited *Post Reports* and produced *Field Trip*; her *Post* work won or was a finalist for the Alfred I. duPont–Columbia University Award three consecutive years, and Amer was a finalist for the Pulitzer Prize as part of the *Washington Post* staff for the paper's environmental-justice coverage. Amer's contributions to the *Gravy* podcast helped that program win the 2015 James Beard Award for Best Podcast. Amer currently serves as Managing Editor of *Love + Radio*, where she managed production of *Blood Memory*, a ten-part narrative series that won the 2025 Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction and was shortlisted for the Whickers Prize. The substantial majority of Amer's voice work was produced in Illinois. *See* ¶¶ 68-71.

90. *The City, Gravy, Post Reports, Field Trip*, and *Love + Radio: Blood Memory* are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, Amazon Music, YouTube, and other major podcast and digital-audio platforms, with metadata identifying Amer as host, narrator, producer, showrunner, or

contributor. *The City* and other Amer-produced work were also distributed through Google Podcasts before Google's discontinuation of that service in 2024. Apple Podcasts' editorial designation of *The City* as Best Podcast of the Year, Amer's three duPont–Columbia honors, and *Blood Memory*'s 2025 Tribeca audio prize would have made Amer's recordings high-value and readily identifiable source material for voice-model training. Amer's body of audio work has been continuously available across these channels for years preceding Samsung's training of the foundational voice synthesis and voice recognition models alleged in this Complaint.

91. Amer's injury is concrete and particular to her in the manner alleged at ¶ 79. Amer is presently a working audio producer, host, and managing editor in long-form investigative podcasting — the market Samsung's voice synthesis products are designed to serve at substantially lower cost than the human production Amer provides. Samsung TTS and Bixby Voice generate podcast-style narrative voice content competing with Amer's on-air hosting and narration. The Bixby Custom Voice Creator base model can be deployed by Samsung's downstream users to generate voice outputs trained on the same foundational models that ingested Amer's voice, extending the unauthorized commercial use of her voiceprint into derivative outputs the Samsung product ecosystem enables. The technology Samsung built using Amer's voiceprint now competes with her active professional work in the same long-form narrative podcasting market in which she has built her career.

*Lindsey Dorcus*

92. Plaintiff Dorcus is a professional audiobook narrator and voiceover artist whose livelihood and artistic practice are centered on the use of her voice. Dorcus has recorded more than 200 audiobooks for many of the major American publishers, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. She is a 2020 Society of Voice Arts and Sciences Voice Arts Award winner, as part of the full-cast voice artist ensemble for the audiobook anthology *Wild Monsters Dance About: Stories from an Unruly Mind,* and a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration. AudioFile Magazine has reviewed her narration as "silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice." Dorcus possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (Dublin and Northern Irish), French, American Southern, Greek, New England, New York, German, Indian, and Russian. All of Dorcus's audiobook narration work was recorded in a professional home studio in Chicago and produced in Illinois. *See* ¶¶ 68-71.

93. Dorcus's audiobook narration is publicly distributed across the major audiobook and digital-audio platforms, including Audible (a subsidiary of Amazon.com, Inc.), Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, and Scribd/Everand. Her complete catalog of narrated titles is searchable and accessible on Audible.com. Audiobook narration is, by published industry and

academic consensus, among the most valuable categories of training audio for voice synthesis models: it provides hours of consistent, professionally produced single-speaker speech with extensive prosodic and emotional variation. Dorcus's body of work has been continuously available through these channels for years preceding Samsung's training of the foundational voice models alleged in this Complaint.

94. Dorcus's injury is concrete, particular, and ongoing in the manner alleged at ¶ 79. Samsung's voice synthesis products generate the same category of long-form single-speaker voice content that Dorcus produces commercially for major publishers. The voice characteristics encoded in Samsung's foundational models include the range of accents and dialects that constitute Dorcus's professional asset, learned in part, on information and belief, from Dorcus's own recordings. Samsung's Bixby Custom Voice Creator base model can be deployed by Samsung's downstream users to clone target voices from short audio samples — including, on information and belief, audio samples drawn from Dorcus's publicly available audiobook catalog — extending the unauthorized commercial use of her voiceprint into derivative outputs the Samsung product ecosystem enables.

*Yohance Lacour*

95. Plaintiff Lacour is a writer, journalist, audio storyteller, playwright, and entrepreneur from the South Side of Chicago whose professional work centers on storytelling about Black Chicago. Lacour began his journalism career in 1997 reporting for *The South Street Journal*, a Black-owned

51

community newspaper in Chicago. Lacour is affiliated with the Invisible Institute, a Chicago-based nonprofit investigative journalism organization. Lacour is the creator, host, writer, and lead reporter of the seven-part investigative and memoir podcast *You Didn't See Nothin'*, a production of the Invisible Institute and USG Audio, in which Lacour revisits the 1997 hate-crime attack on Lenard Clark he had covered as a young community journalist. In 2024, *You Didn't See Nothin'* was awarded the Pulitzer Prize for Audio Reporting and a Peabody Award. The series was named among Apple Podcasts' "100 Best Podcasts of All Time," received nominations at the Signal Podcasting Awards, and received four nominations at the Black Podcasting Awards. All of Lacour's recorded audio storytelling and journalism work was produced and recorded in Chicago, Illinois. *See* ¶¶ 68-71.

96.     *You Didn't See Nothin'* and Lacour's interview appearances are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Amazon Music, Overcast, and other major podcast and digital-audio platforms, with metadata identifying Lacour as creator, host, narrator, and lead reporter. Lacour has also appeared as a featured guest on NPR's *Fresh Air with Tonya Mosley*, NPR's *All Things Considered* with Adrian Florido, the Canadian Broadcasting Corporation's *Crime Story* podcast, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast. *You Didn't See Nothin'*'s recognition — Pulitzer Prize, Peabody Award, Apple Podcasts' "100 Best Podcasts of All Time" — would have made Lacour's recordings high-value and readily identifiable source material for voice-model training. The recordings have been continuously

available since 2023, preceding Samsung's training of the foundational voice models alleged in this Complaint.

97.     Lacour's injury is concrete and particular to him in the manner alleged at ¶ 79. Lacour's professional identity is defined by his work as an investigative audio storyteller and narrator from the South Side of Chicago, a market position in which authentic, place-specific Black narration is the core product. The investigative and narrative podcast markets in which Lacour earns his livelihood, including markets reaching the Black audiences and communities about whom Lacour reports, are markets Samsung's voice synthesis products are designed to serve at a fraction of the cost of human production. Samsung TTS and Bixby Voice generate podcast-style narrative voice content competing with Lacour's on-air narration in *You Didn't See Nothin'* and his other audio storytelling work. The technology Samsung built using Lacour's voiceprint operates in the same audio markets — long-form narrative audio journalism, podcast production, and investigative storytelling — in which Lacour earns his living.

*Victoria Nassif*

98.     Plaintiff Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director based in Illinois, and a classically trained mezzo-soprano singer. Nassif has performed on-camera in multiple episodes of NBC's *Chicago P.D.* (Season 12) and in nationally broadcast commercials. As a professional audiobook narrator, Nassif has recorded audiobooks for Penguin Random House (Random House Audio),

Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster, with notable narration credits including *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), in which Nassif performed multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist, shortlisted for the Ursula K. Le Guin Prize and named a *them* Best Book of the Year; *Gulf* by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life*, a bilingual Arabic-English anthology compiled by Susan Abulhawa. Nassif's professionally recognized range of accents and dialects includes General American, British (Received Pronunciation and Cockney), Persian, Levantine Arabic, and American Southern. As a first-generation Lebanese-Palestinian American who speaks Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle Eastern characters and settings — a distinctive professional asset in the audiobook narration industry. All of Nassif's audiobook narration and voiceover work was produced and recorded in Illinois. *See* ¶¶ 68-71.

99. Nassif's audiobook narration is publicly distributed across major audiobook and digital-audio platforms, including Audible, Apple Books, Spotify, Libro.fm, and other major audiobook retailers and subscription services. Nassif's on-camera work for NBC's *Chicago P.D.* and nationally broadcast commercials is distributed across broadcast and streaming platforms, including NBC and Peacock. Nassif's distinctive cultural and

linguistic position — authentic Lebanese-Palestinian American narration with native Arabic-accent capability — is a category of professional voice work uniquely valuable for training the multilingual and cross-accent voice synthesis capabilities Samsung markets in Galaxy AI Live Translate and Interpreter, which Samsung deploys across more than twenty languages and dialects including Arabic. Nassif's recordings have been continuously available on these platforms for years preceding Samsung's training of the foundational voice models alleged in this Complaint.

100. Nassif's injury is concrete, particular, and ongoing in the manner alleged at ¶ 79. Nassif occupies a distinctive market position as a Lebanese-Palestinian American narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors. Samsung's Galaxy AI Live Translate and Interpreter products, which support voice synthesis and voice recognition across more than twenty languages and dialects including Arabic, compete specifically with Nassif's professional niche; the multilingual voice capability that makes those products commercially valuable to Samsung depends on training data of precisely the category Nassif's authentic Levantine Arabic-accented narration supplies. Samsung's Bixby Custom Voice Creator base model can be deployed by Samsung's downstream users to clone target voices from short audio samples — including, on information and belief, samples drawn from Nassif's publicly available audiobook catalog — generating derivative outputs that strip the cultural authenticity (the lived experience of a first-generation Lebanese-Palestinian American voicing Arab and Palestinian

55

American authors' work) on which Nassif's professional market position depends, while replicating the surface vocal characteristics of her performance.

*Commercial Substitution and Economic Harm*
*to Plaintiffs and Class Members*

101. Samsung's voice products operate in the professional markets in which Plaintiffs and Class members earn their livelihoods: audiobook narration, voice acting, podcast production and hosting, broadcast journalism, advertising voiceover, e-learning narration, video-game voice acting, and live multilingual interpretation.

102. Samsung's specific voice products map onto specific categories of that work. The Samsung TTS engine generates the long-form, single-speaker voice content that audiobook narrators, voiceover artists, and podcast hosts produce commercially. Galaxy AI Live Translate and Interpreter generate real-time multilingual voice output comparable to that of professional interpreters. The Bixby Custom Voice Creator base model, and the zero-shot voice-cloning capability Samsung Research has publicly demonstrated, generate synthetic voice content from short audio samples in place of studio recording work. Galaxy AI Transcript Assist automates speaker-separated transcription. And the Brain Health voice-biomarker service repurposes recorded human voice as input to a Samsung-commercialized diagnostic product, opening a separate commercial market in which Samsung deploys voiceprints extracted without notice or consent.

103. Samsung offers these capabilities at a fraction of the cost of hiring human performers. Galaxy AI features are bundled with Galaxy devices at no

separate charge. Samsung TTS and the Bixby Custom Voice Creator base model generate audio at compute-time cost rather than the per-finished-hour rates ($200 to $400 per finished hour for professional audiobook narration; comparable per-project rates for voiceover, e-learning, and game voice work) that Plaintiffs and Class members earn for human production. Each unit of synthetic voice content Samsung generates is a unit of demand diverted from licensed human performance in the same market.

104.  The market substitution is not merely temporal but causal. Samsung's voice products generate the audio they generate because the voiceprints encoded in Samsung's foundational models, including, on information and belief, voiceprints derived from Plaintiffs' and Class members' recordings, produce that output. The product is the data; the data is the product. The competitive position Samsung has placed Plaintiffs and Class members in is one Samsung built using Plaintiffs' and Class members' own voices, and one Plaintiffs and Class members neither chose nor authorized.

*Samsung Acted Willfully and Recklessly*

105.  Samsung's collection, retention, commercial exploitation, dissemination, and inadequate protection of Class members' voiceprints was not the result of inadvertence or unfamiliarity with BIPA. Samsung acted with knowledge of, or at a minimum reckless disregard for, its obligations under Illinois law. Each violation of § 15(a), (b), (c), (d), and (e) is a discrete, classwide breach of duty, supporting recovery on a per-person, per-subsection basis of $5,000 per intentional or reckless violation under 740 ILCS 14/20(2), or, in the

alternative, $1,000 per negligent violation under 740 ILCS 14/20(1), consistent with the statute as amended and as construed in *Clay*.

106. Samsung knew. BIPA has been the law of Illinois since 2008. By the time Samsung built and deployed the voice-AI pipeline alleged here, BIPA had produced some of the largest privacy settlements in American history — Facebook ($650 million), Google ($100 million), TikTok/ByteDance ($92 million) — and voice-AI-specific litigation was active against comparable defendants in *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y.), *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del.), and *Kogon v. Google LLC*, No. 1:26-cv-02582 (N.D. Ill.), each alleging that AI voice companies built commercial products on recordings ingested without speaker consent. Samsung itself was actively defending biometric-privacy litigation in this District at the same time. *G.T. v. Samsung Electronics America, Inc.*, No. 21-cv-4976 (N.D. Ill.) (alleging Samsung's Gallery photo application extracted biometric facial geometry from users' photos in violation of BIPA). Samsung was litigating BIPA compliance for facial geometry in this District at the same time it was extracting voiceprints from voice recordings without compliance.

107. Samsung described its own voice processing in BIPA's statutory terms. Samsung's U.S. Privacy Policy uses the words "voiceprint" and "biometric data." Samsung's consumer-facing privacy webpage acknowledges that voice recordings flow from Samsung devices to Samsung servers and are used "for general learning purposes" — that is, to train Samsung's voice models. Samsung Research's published technical pipeline encodes target-

speaker recordings into discrete acoustic tokens, reproduces them as synthesized speech, and evaluates the result using speaker-embedding cosine similarity. Samsung built the pipeline, published the research, and shipped the Voice Products on the very capability — voiceprint extraction — at issue in this Complaint. Samsung does not use BIPA's vocabulary by accident. Samsung uses it because Samsung's voice systems process the data the vocabulary describes.

108.   Samsung knows how to build voice products around consent — and chose not to, for Plaintiffs. The contemporaneous design of the Bixby Custom Voice Creator confirms it: Samsung built that product around informed, opt-in consent for the user's own voice, deploying the same Samsung Research engineering team and the same Samsung legal department that built the foundational voice models on which Bixby Voice, Samsung TTS, Live Translate, Interpreter, Transcript Assist, the Custom Voice Creator base model, and the Brain Health voice-biomarker service depend. Samsung built consent for the user's own voice. Samsung did not build it for the voices its products were built on. The same selectivity runs across Samsung's broader AI representations. Samsung's affirmative "safe data" representation for the Gauss Image model is conspicuous in its absence from Samsung's voice models. Samsung's visible watermarks on AI-edited images at the Galaxy S24 launch are conspicuous in the absence of a corresponding measure for voice provenance. Samsung's Knox enterprise security platform protects Samsung's own proprietary data with defense-grade controls; no equivalent infrastructure

protects the biometric data Samsung extracted from Class members' recordings. Samsung addresses the AI risks it chooses to address. Samsung does not address the ones it does not.

109. Samsung chose speed and scale over compliance. Samsung Research funds external research that augments training data through voice cloning, using one set of speakers' voiceprints to synthesize additional inputs to expand the corpus further. The institutional approach treats speakers' voices as inputs to be sourced, cloned, and reproduced at scale, not as biometric identifiers requiring notice and consent. If Samsung had sufficient consented or licensed training data, it would have had no incentive to augment its corpora through synthetic speech — and every incentive to say so. With foundational voice training corpora at the scale required to support Galaxy AI in more than twenty languages, Bixby deployed across the owners of more than 300 million Galaxy devices, and the Brain Health voice-biomarker service Samsung unveiled at CES 2026, BIPA-compliant collection would have constrained the speed and scale of Samsung's voice-AI development. Samsung did not let it. Samsung promised "AI for All." Samsung delivered AI for some — at the expense of others. That was not an oversight. It was a business decision.

## CLASS ACTION ALLEGATIONS

135. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings Samsung

extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of voice synthesis or voice recognition models, or commercial voice products derived from those models, during the Class Period.

136. The Class Period runs from the earlier of (a) the date Samsung first ingested any voice recording into the training pipeline for any of its foundational voice synthesis or voice recognition models, or (b) January 1, 2012, through the date of judgment. Discovery will establish the operative start date.

137. Excluded from the Class are: (i) Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., and each of their parents, subsidiaries, affiliates, and controlled entities; (ii) all current and former officers and directors of Samsung; (iii) Samsung's employees, contractors, agents, and counsel; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) the immediate family members of any person excluded above; and (vi) any person who executed a written release authorizing Samsung's use of their voice recordings to train, fine-tune, evaluate, or operate Samsung's voice synthesis or voice recognition models, in compliance with 740 ILCS 14/15(b).

138. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

139. *Ascertainability.* Class membership is defined by objective criteria. Whether a particular voice recording entered Samsung's training pipeline is a binary factual question, and the records that answer it — training-data manifests, ingestion logs, source-URL records, dataset-version records, speaker-embedding indices, and associated speaker- and file-level identifiers — are within Samsung's exclusive control. Class membership can be further confirmed through publicly available distribution metadata (audiobook platform records, podcast directory records, streaming service catalogs, broadcast archive records) and through voice-matching analysis comparing Samsung's voice model outputs against publicly available recordings of Class members.

140. *Numerosity.* Joinder is impracticable. Fed. R. Civ. P. 23(a)(1). On information and belief, the number of speakers whose Illinois-recorded voice work was ingested into Samsung's training pipelines runs to the hundreds of thousands. As alleged at ¶¶ 41-44 and ¶ 65, Samsung's foundational voice models support Galaxy AI's twenty-plus languages and dialects, power voice products deployed across more than 300 million Galaxy devices, and have been augmented through Samsung-funded voice-cloning research operating at industrial scale, capabilities that require a correspondingly large and diverse training population. The Class includes (a) the broadcast journalists, podcasters, audiobook narrators, voice actors, voiceover artists, and other professional voice talent who produced work in Illinois during the Class Period and (b) the interview subjects, guests, panelists, witnesses, callers, public

officials, and other speakers whose voices were captured in Illinois-produced or Illinois-recorded broadcast, podcast, audiobook, and archival audio content publicly accessible on the platforms from which, on information and belief, Samsung sourced training data. The exact number is within Samsung's exclusive control and will be established through discovery.

141. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). Samsung did not engage in any individualized notice, consent, retention-policy disclosure, written-release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into Samsung's voice training pipelines. The same pipelines ingested the same categories of voice recordings under the same absent-consent posture, applied to every Class member through the same automated and standardized process. The questions whether Samsung complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements can be answered classwide because Samsung's noncompliance was identical as to every Class member.

142. Common questions of law and fact include, without limitation:

(a) whether the computational representations of vocal characteristics Samsung extracts during voice-model training, variously described in Samsung Research's published documentation as speaker embeddings, acoustic tokens, semantic tokens, and neural-codec representations, constitute "voiceprints" or "biometric information" within the meaning of BIPA;

(b)      whether Samsung informed Class members in writing that their biometric identifiers were being collected, of the specific purpose and length of term of collection, and obtained a written release, as 740 ILCS 14/15(b) requires;

(c)      whether Samsung developed and made publicly available a written retention and destruction policy applicable to Class members' biometric identifiers, as 740 ILCS 14/15(a) requires;

(d)      whether Samsung sold, leased, traded, or otherwise profited from Class members' biometric identifiers in violation of 740 ILCS 14/15(c);

(e)      whether Samsung disclosed or disseminated Class members' biometric identifiers — including, on information and belief, to third-party AI providers and across Samsung's global affiliate network — without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

(f)      whether Samsung stored, transmitted, and protected Class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its protection of other confidential and sensitive information, as 740 ILCS 14/15(e)(2) requires;

(g)      whether Samsung's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(h)      whether Samsung used Class members' voices and identities for commercial purposes without prior written consent in violation of 765 ILCS 1075/30(a);

(i)     whether Samsung's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of 765 ILCS 1075/30(b) and (d), as amended by P.A. 103-836, and Samsung materially contributes to or facilitates their distribution;

(j)     whether Samsung's conduct constitutes unfair or deceptive practices under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2;

(k)     whether Samsung's conduct constitutes deceptive trade practices likely to cause confusion in violation of 815 ILCS 510/2(a)(2) and (a)(3);

(l)     whether Samsung was unjustly enriched by its unauthorized use of Class members' voice data; and

(m)     the appropriate measures of damages, restitution, and injunctive relief.

143.  *Typicality.* The named Plaintiffs' claims are typical of the Class's claims. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois. Samsung, on information and belief, ingested those recordings into the training pipelines for its foundational voice models without notice, consent, or written release. The legal theories asserted on behalf of the Class apply with equal force to each named Plaintiff and to every other Class member.

144.  *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent Class members; each named

Plaintiff has the same incentive as every other Class member to maximize recovery and to obtain comprehensive injunctive relief. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

145. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because Samsung has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Samsung's training pipelines operated uniformly across every Class member's voice recordings; Samsung's failure to obtain BIPA-compliant consent was uniform; Samsung's failure to publish a retention and destruction policy applicable to non-user training-data subjects was uniform; and Samsung's continuing possession and commercial exploitation of Class members' voiceprints, encoded in the foundational voice models Samsung deploys to more than 300 million Galaxy devices, is uniform. Plaintiffs seek classwide injunctive relief — including the destruction or retraining of the foundational voice models in which Class members' voiceprints are encoded — that necessarily applies on the same terms to every Class member.

146. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate on the damages and restitutionary claims, because common questions of law and fact predominate over questions affecting only individual

Class members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

147. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. *First,* whether Samsung's voice-model training pipelines extract voiceprints within the meaning of BIPA is a common technical question with a common answer, as alleged at ¶¶ 45-49. *Second,* whether Samsung complied with BIPA's notice, consent, retention, profiting, dissemination, and biometric-data-protection requirements is a common legal question with a common answer: Samsung did not, with respect to any non-user whose voice recordings were ingested into the training pipelines. *Third,* whether Samsung's conduct was willful or reckless turns on Samsung's institutional knowledge and decision-making, including the asymmetry between Samsung's consent infrastructure for the Bixby Custom Voice Creator and the absence of consent infrastructure for the voices on which Samsung's foundational models depend — all of which are common to the Class. The principal individual question — whether a specific Class member's voice recordings entered the training pipelines — is binary and resolvable from Samsung's own records. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740 ILCS 14/20, as amended by P.A. 103-769 and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), do not predominate over the common liability questions because the per-violation amounts are statutorily fixed.

148. *Superiority.* A class action is the superior method for adjudicating these claims.

(a) *Class members' interest in individual control.* Class members are voice professionals — broadcast journalists, audiobook narrators, podcasters, voiceover artists, voice actors — and incidental speakers whose voiceprints were extracted without their knowledge. Many remain unaware that their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against one of the largest publicly traded technology companies in the world, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify the cost and burden of independent representation. A class action is the only realistic vehicle for redress.

(b) *Existing related litigation.* Plaintiffs are unaware of any other action asserting these claims against Samsung on behalf of persons whose voice recordings were produced or recorded in Illinois and used to train Samsung's foundational voice models.

(c) *Desirability of concentration in this forum.* Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois statutes. The injuries were suffered in Illinois. Samsung conducts substantial commercial business in Illinois through Galaxy device sales, the Galaxy AI feature suite preinstalled on those devices, and ongoing service performance to Illinois residents. The Northern District of Illinois has substantial expertise with BIPA litigation and is the natural forum for

adjudication of Illinois residents' Illinois-statutory claims arising from Samsung's commercial conduct in Illinois.

(d) *Manageability*. The case is manageable as a class action. Samsung's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; Class membership can be determined from Samsung's records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim.

149. *Tolling and continuing violations.* To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by Samsung's concealment of its training-data sources, by Samsung's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Samsung had ingested their recordings into its training pipelines, and by the continuing nature of Samsung's violations. Independently, each retention of the unlawfully obtained biometric data, each operation of the foundational voice models in which the unlawfully obtained biometric data is encoded, and each disclosure or transmission of that biometric data is a separate violation of BIPA under *Cothron v. White Castle System, Inc.*, 216 N.E.3d 918 (Ill. 2023), each accruing a separate limitations period from the date of the discrete violative act.

69

## CLAIMS FOR RELIEF

### Count I

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

150.    Plaintiffs reallege and incorporate by reference all allegations in this complaint.

151.    Plaintiffs bring this Count individually and on behalf of the Class.

152.    BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to mean "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

153.    Each Samsung Defendant is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

154.    Samsung collected, captured, and otherwise obtained voiceprints and biometric information from Class members' voice recordings by ingesting those recordings into its training pipeline and extracting computational representations of the distinctive acoustic characteristics of Class members'

70

voices, as alleged at ¶¶ 45-49. The resulting representations — variously denominated as speaker embeddings, acoustic tokens, semantic tokens, and neural-codec representations in Samsung Research's technical and product documentation — are voiceprints and biometric information within the meaning of BIPA.

155. Samsung did not, before extracting Plaintiffs' or Class members' voiceprints, inform any Plaintiff or Class member in writing that biometric identifiers were being collected or stored, inform any of them in writing of the specific purpose or length of term of collection, or receive a written release. Samsung obtained no consent of any kind, in any form, from any Plaintiff or Class member.

156. Samsung's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 105-109. In the alternative, Samsung's violations were negligent.

157. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member and each violation, the greater of liquidated damages of $1,000 (negligent) or $5,000 (intentional or reckless) or actual damages, on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026); injunctive relief on the terms set forth in the Prayer for Relief; and reasonable attorneys' fees, costs, expert witness fees, and other litigation expenses.

## Count II

## Violation of the Illinois Biometric Information Privacy Act,

## 740 ILCS 14/15(a)

*Brought on behalf of the Class*

158.  Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

159.  Plaintiffs bring this Count individually and on behalf of the Class.

160.  Section 15(a) of BIPA requires a private entity in possession of biometric identifiers or biometric information to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Plaintiffs and Class members never interacted with Samsung in connection with the collection of their biometric data, the operative destruction prong is that the biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

161.  Samsung has been, and remains, in possession of voiceprints and biometric information extracted from Plaintiffs' and Class members' voice recordings. Those voiceprints and biometric information persist in the parameters of Samsung's foundational voice synthesis and voice recognition

72

models and continue to be deployed in the commercial products Samsung ships today.

162. Samsung has not developed and made publicly available a retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training data and encoded in Samsung's foundational voice models. The retention provisions in Samsung's privacy policy are keyed to user-controlled deletion of biometric data "stored on your device" and to user-accessible settings — both facially inapplicable to Class members, who have no Samsung device containing their biometric data and no settings to navigate.

163. Samsung's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 105-109. In the alternative, Samsung's violations were negligent.

164. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count III

## Violation of the Illinois Biometric Information Privacy Act,

## 740 ILCS 14/15(c)

*Brought on behalf of the Class*

165. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

166. Plaintiffs bring this Count individually and on behalf of the Class.

167. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or

otherwise profit from a person's or a customer's biometric identifier or biometric information. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond selling, leasing, or trading.

168. Samsung has profited, and continues to profit, from Plaintiffs' and Class members' voiceprints and biometric information by using them to develop, train, and commercially operate the voice synthesis and voice recognition products at issue, as alleged at ¶¶ 72-73. Samsung's profiting flows through Galaxy device sales, the Galaxy AI feature suite bundled with those devices, enterprise mobility licensing, the Samsung TTS engine, the Brain Health voice-biomarker service, and Samsung's broader integrated commercial chain. The voice characteristics encoded in Samsung's foundational voice models are what enable those products to function: the biometric data and the product are, at this point, the same thing. Samsung's profiting from Plaintiffs' and Class members' biometric identifiers does not fall within any exception to § 15(c).

169. Samsung's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 105-109. In the alternative, Samsung's violations were negligent.

170. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count IV

## Violation of the Illinois Biometric Information Privacy Act,

## 740 ILCS 14/15(d)

*Brought on behalf of the Class*

171.   Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

172.   Plaintiffs bring this Count individually and on behalf of the Class.

173.   Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's biometric identifier or biometric information unless an enumerated exception applies. 740 ILCS 14/15(d).

174.   On information and belief, Samsung has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints and biometric information across Samsung's global affiliate network — including in the Republic of Korea, the United States, Poland, India, China, the United Kingdom, and Canada — in the ordinary course of training, evaluating, deploying, and operating its commercial voice products, as alleged at ¶¶ 74-76. On information and belief, Samsung has additionally disseminated voice data to third-party AI providers, including Google's Gemini and Perplexity AI, in connection with cloud-based Galaxy AI processing. Plaintiffs and Class members did not consent to any of these disseminations, and no enumerated exception under § 15(d) applies.

175. Samsung's violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 105-109. In the alternative, Samsung's violations were negligent.

176. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count V

## Violation of the Illinois Biometric Information Privacy Act,

## 740 ILCS 14/15(e)

*Brought on behalf of the Class*

177. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

178. Plaintiffs bring this Count individually and on behalf of the Class.

179. Section 15(e) of BIPA imposes two distinct duties on private entities in possession of biometric data: under § 15(e)(1), to store, transmit, and protect the data using the reasonable standard of care within the entity's industry; and under § 15(e)(2), to do so in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: an entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information.

180. Samsung fails the § 15(e)(2) asymmetry test. Samsung markets and deploys the Samsung Knox enterprise security platform as a defense-grade solution for Samsung's own proprietary data, intellectual property, source

code, internal communications, and enterprise systems across Samsung's global enterprise environment. Samsung's consumer-facing Bixby Voice infrastructure separately protects user-supplied biometric data through on-device processing, with Samsung's privacy policy assuring users that biometric data stored on the user's own device is "not accessible by Samsung." Samsung has built no equivalent infrastructure for Class members' biometric data extracted from training recordings: no inventory, no notification, no opt-out mechanism, no destruction protocol, no access controls comparable to Knox, no on-device protection comparable to the protections Samsung provides for its own users. Samsung's treatment of Class members' biometric data is materially less protective than its treatment of its other confidential and sensitive information.

181. Samsung independently fails the § 15(e)(1) reasonable-standard-of-care test. The reasonable standard of care for biometric data presupposes some mechanism by which the data subject can monitor, verify, or challenge how the data is stored, transmitted, and protected. Samsung has provided none. Class members have no mechanism to request access to, correction of, or deletion of their biometric data from Samsung's training datasets or models; no contractual or other relationship with Samsung that would create any such mechanism; and no ability to learn whether Samsung possesses their biometric data at all. A private entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of that data.

182. The asymmetry between Samsung's user-facing and own-data protections and Samsung's complete absence of protection for Class members' biometric data is not a function of technical limitation; it is a function of selective application, as alleged at ¶¶ 50, 108.

183. Samsung's violations of § 15(e)(1) and § 15(e)(2) were intentional or reckless, as alleged at ¶¶ 105-109. In the alternative, Samsung's violations were negligent.

184. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I, including the destruction or retraining of the foundational voice models in which Class members' voiceprints are encoded.

## Count VI

## Violation of the Illinois Right of Publicity Act,

## 765 ILCS 1075/1 et seq.

*Brought on behalf of the Class*

185. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

186. Plaintiffs bring this Count individually and on behalf of the Class.

187. IRPA provides that "[a] person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent." 765 ILCS 1075/30(a). "Identity" is defined to include an individual's "voice." 765 ILCS 1075/5.

188. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

189. Samsung used Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a). Samsung extracted and modeled the distinctive vocal characteristics embodied in Plaintiffs' and Class members' recordings and used those characteristics to develop, train, and commercially operate the voice synthesis and voice recognition products Samsung monetizes through Galaxy device sales, the Galaxy AI feature suite, enterprise mobility licensing, the Samsung TTS engine, the Brain Health voice-biomarker service, and Samsung's broader integrated commercial chain, as alleged at ¶¶ 72-73. Samsung holds out its products' ability to generate realistic, expressive, multilingual, and speaker-aware voice content as core commercial features — capabilities built on the vocal identities of the individuals whose recordings were used to train the models.

190. IRPA, as amended by P.A. 103-836 effective January 1, 2025, separately prohibits knowingly distributing, transmitting, or otherwise making available to the general public a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual's voice. 765 ILCS 1075/30(b). The statute defines an "unauthorized digital replica" as a newly created, electronically generated representation of an individual's voice fixed in

79

a sound recording or audiovisual work in which the individual did not actually perform, made without the individual's consent. 765 ILCS 1075/5. The statute also imposes liability on any person who knowingly materially contributes to or facilitates such distribution. 765 ILCS 1075/30(d).

191. On information and belief, Samsung's voice synthesis and voice cloning products generate and distribute voice outputs that replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members. By generating and distributing those outputs through Galaxy devices, the Galaxy AI feature suite, the Samsung TTS engine, the Bixby Custom Voice Creator, and related products, Samsung knowingly distributes and makes available sound recordings containing unauthorized digital replicas, and knowingly materially contributes to and facilitates the distribution of such replicas through the foundational voice models Samsung deploys to the owners of more than 300 million Galaxy devices.

192. Samsung's violations of IRPA were willful and knowing. As alleged at ¶ 108, Samsung's design of the Bixby Custom Voice Creator around explicit speaker consent for cloning the user's own voice confirms Samsung's understanding that voice-based AI products require consent from the people whose voices are used. Samsung implemented that requirement for the user's own voice and did not implement it for the voices on which Samsung's foundational voice models were trained.

193. Plaintiffs and the Class have suffered and continue to suffer injury, including loss of control over commercial use of their identities, dilution and

commodification of their voices, displacement in the professional markets where they earn their livelihoods, and economic losses including diversion of licensing value and diminished demand for authentic vocal performances.

194. Plaintiffs and the Class seek all relief available under IRPA, including actual damages, the profits Samsung earned from its unauthorized use to the extent not taken into account in computing actual damages, statutory minimum damages of $1,000 per violation under 765 ILCS 1075/40, punitive damages, injunctive relief on the terms set forth in the Prayer for Relief, and reasonable attorneys' fees and costs under 765 ILCS 1075/55.

**Count VII**

**Violation of the Illinois Consumer Fraud and
Deceptive Business Practices Act,**

**815 ILCS 505/1 et seq.**

*Brought on behalf of the Unjust Enrichment Subclass*

195. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

196. Plaintiffs bring this Count individually and on behalf of the Class.

197. Samsung engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, distributing, and selling Galaxy devices and voice-AI services to Illinois residents, and by collecting, extracting, and commercially exploiting Illinois residents' biometric data through those products.

198. Samsung's conduct is unfair within the meaning of ICFA under the three-part test articulated in *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d

403, 417–18 (2002). First, Samsung's conduct offends Illinois public policy as embodied in BIPA and IRPA — Illinois statutes specifically enacted to protect biometric privacy and the commercial use of personal identity. Second, Samsung's conduct causes substantial economic and privacy injury to Illinois residents, including the irreplaceable loss of control over biometric identifiers, the unauthorized commercial use of vocal identities, and market displacement in the professional voice industries where Plaintiffs and Class members earn their livelihoods. Third, the injury could not reasonably have been avoided by Plaintiffs and Class members, who had no knowledge that their voice recordings were being ingested into Samsung's training pipelines, no notice of the extraction, no mechanism to refuse, and no mechanism even to discover whether their biometric data was in Samsung's possession.

199. Samsung's conduct is independently deceptive within the meaning of ICFA. Samsung represented to the public, in connection with the November 2023 launch of its Gauss generative AI suite, that the Gauss Image model "was learned from safe data that does not infringe on licenses or personal information." Samsung made no comparable representation about its voice synthesis or voice recognition models. The asymmetric disclosure conveyed the misleading implication that Samsung's other generative AI products were sourced on equivalent terms — when in fact, on information and belief, Samsung's voice models were trained on voiceprints extracted without consent.

200. Samsung's unfair and deceptive conduct proximately caused actual economic injury to Plaintiffs and the Class, including lost and

82

diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from Samsung's decision to collect and commercially exploit Plaintiffs' biometric data without authorization, not from the mere existence of competing AI products.

201. Samsung's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and the Class, as alleged at ¶¶ 105-109.

202. Plaintiffs and the Class seek all relief available under ICFA, including actual economic damages, punitive damages under 815 ILCS 505/10a(c), injunctive relief on the terms set forth in the Prayer for Relief, attorneys' fees and costs under 815 ILCS 505/10a, and such other relief as the Court deems just and proper.

## Count VIII

### Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.

*Brought on behalf of the Class (injunctive relief only)*

203. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

204. Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

205. Samsung has engaged in deceptive trade practices likely to cause confusion or misunderstanding in the marketplace within the meaning of 815 ILCS 510/2(a)(2) (causing likelihood of confusion or misunderstanding as to source, sponsorship, approval, or certification of goods or services) and 815

ILCS 510/2(a)(3) (causing likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another). Samsung's voice synthesis products generate voice outputs that simulate authentic human speech. Once generated, these outputs can be downloaded, shared, distributed, and commercially exploited without consumer-facing disclosure that the underlying foundational models were built on voiceprints extracted without consent, or that the speakers whose vocal characteristics are reproduced did not authorize the use. This creates a likelihood of confusion about whether real human speakers, including Plaintiffs and Class members, created, endorsed, or authorized the synthetic voice content.

206. Plaintiffs and Class members are persons likely to be damaged by Samsung's deceptive practices. Samsung's conduct diverts demand from licensed human voice performances, impairs attribution and provenance in the voice services markets where Plaintiffs and Class members earn their livelihoods, and creates marketplace confusion about the source and authorization status of AI-generated voice content. Under 815 ILCS 510/3, actual confusion and actual damages need not be shown.

207. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Samsung to provide adequate consumer-facing disclosure that voice outputs are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use. Samsung's conduct

was willful within the meaning of 815 ILCS 510/3, entitling Plaintiffs and the Class to reasonable attorneys' fees.

## Count IX

### Unjust Enrichment (Illinois Common Law)

*Brought on behalf of the Unjust Enrichment Subclass*

208. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

209. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

210. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

211. Samsung obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, biometric information, and identity attributes without permission and without compensation. These benefits include the avoided costs of licensing or obtaining consent for the voice recordings used to train Samsung's foundational voice models; the product capability and competitive advantage Samsung captured by training its models on a diverse corpus of professional and incidental human voices, including those of Plaintiffs and Class members; and the revenue Samsung generates

and continues to generate through the commercial exploitation of those models.

212. Samsung obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and resources to develop their voices and create professional or otherwise valuable recordings. Samsung's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to Samsung, and Samsung's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods.

213. Samsung's retention of these benefits is unjust. Samsung's conduct violated the Illinois statutory protections for biometric data (BIPA) and personal identity (IRPA), each of which expresses the public policy of Illinois that the unauthorized commercial extraction of biometric and identity-related personal attributes is unlawful. Samsung could have pursued a lawful licensing path with respect to Plaintiffs and Class members; it chose not to.

214. Plaintiffs and the Class seek restitution of the benefits Samsung has unjustly retained, including disgorgement of Samsung's profits attributable to the unauthorized exploitation of Plaintiffs' and Class members' voiceprints, biometric information, and identities; an accounting of those benefits; and such other equitable relief as the Court deems just and proper.

86

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

A.      *Class Certification.* Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

B.      *Judgment.* Enter judgment in favor of Plaintiffs and all Class members and against the Samsung Defendants, jointly and severally, on all Counts on which Samsung is found liable.

C.      *Injunctive Relief.* Enter declaratory and injunctive relief, including a permanent injunction:

(1)      Enjoining Samsung from collecting, capturing, obtaining, ingesting, processing, or using voiceprints, biometric identifiers, or biometric information from any voice recording produced or recorded in Illinois unless Samsung has first complied with 740 ILCS 14/15(b)'s notice, written-purpose-and-duration, and written-release requirements with respect to the speaker;

(2)      Requiring Samsung to develop, publish, and maintain a written retention and destruction policy, made available to the public, that complies with 740 ILCS 14/15(a) and that applies to all voiceprints and biometric information extracted from voice recordings ingested into Samsung's voice synthesis, voice recognition, and related voice-AI training pipelines,

87

including all such data already in Samsung's possession at the time of judgment;

(3)     Requiring Samsung to identify, in a court-supervised disclosure to Class counsel and to the Court, the sources, scale, provenance, and acquisition pathways of the voice data used to train each of Samsung's voice synthesis and voice recognition models during the Class Period, including each contractual instrument, platform, dataset, and corpus from which voice recordings were obtained;

(4)     Requiring Samsung to provide, on terms approved by the Court, a mechanism by which non-users, including Plaintiffs and Class members, can (i) request notice of whether their voice recordings were ingested into Samsung's training pipelines, (ii) request access to the biometric data Samsung holds derived from their recordings, (iii) request correction or deletion of that data, and (iv) opt out of further use of that data in Samsung's voice models and downstream commercial products;

(5)     Requiring Samsung to identify and disclose every Samsung subsidiary, affiliate, vendor, service provider, and third-party processor — including any third-party AI providers receiving voice data in connection with cloud-based Galaxy AI processing — with access to the voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois, and to terminate any access by such entities that is not necessary to compliance with this Court's order;

(6)     Requiring Samsung to destroy, or to retrain without the unlawfully obtained data, every voice synthesis, voice recognition, and related voice-AI model in which voiceprints and biometric information extracted from voice recordings produced or recorded in Illinois are encoded — including without limitation the foundational models on which Samsung's Voice Products depend — together with each downstream model, fine-tuned model, derivative model, and commercial product whose operation depends on or incorporates those models;

(7)     Requiring Samsung, as to any open-weight, third-party, or external release of Samsung voice models in which the unlawfully obtained data is encoded, to take all reasonable measures to recall and remove the affected model parameters from public availability, including by issuing takedown requests, ceasing further distribution, and ceasing further support of derivative releases;

(8)     Requiring Samsung to implement protective measures for any voiceprints or biometric information lawfully obtained going forward that satisfy 740 ILCS 14/15(e), including, at a minimum, the storage, transmission, encryption, isolation, scope-restriction, and access-control measures Samsung applies to its own confidential and sensitive information through Samsung Knox and to its users' on-device biometric data through Bixby's on-device protections;

(9)     Enjoining Samsung from using Plaintiffs' or Class members' identities, including their voices, for commercial purposes without prior written

consent in violation of 765 ILCS 1075/30(a); from knowingly distributing or making available sound recordings or audiovisual works containing unauthorized digital replicas of Plaintiffs' or Class members' voices in violation of 765 ILCS 1075/30(b); and from materially contributing to or facilitating such distribution in violation of 765 ILCS 1075/30(d); and

(10)    Requiring Samsung to implement corrective consumer-facing disclosures, in such form as the Court approves, sufficient to inform consumers that voice outputs generated by Samsung's voice products are AI-generated, that the underlying foundational voice models were built using voice recordings of unidentified speakers, and that the individuals whose vocal characteristics are reproduced did not authorize the use, and to prevent confusion under 815 ILCS 510/2(a)(2) and (a)(3) about the source, authorization, and consent status of AI-generated voice content Samsung distributes.

D.    *BIPA Statutory Damages.* Award liquidated or actual damages on a per-person, per-subsection basis under 740 ILCS 14/20, as amended by P.A. 103-769 and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $5,000 per intentional or reckless violation, or in the alternative $1,000 per negligent violation, for violations of 740 ILCS 14/15(a), (b), (c), (d), and (e).

E.    *IRPA Damages.* Award actual damages, statutory damages of $1,000 per violation, punitive damages, and disgorgement of profits under 765 ILCS 1075/40.

F.      *ICFA Damages.* Award actual economic damages and punitive damages under 815 ILCS 505/10a.

G.      *Disgorgement and Restitution.* Award disgorgement of Samsung's ill-gotten gains and restitution to Plaintiffs and the Class, including disgorgement attributable to Samsung's Galaxy mobile device sales, Samsung Smart TV and home appliance sales, enterprise mobility licensing and Knox-related enterprise services, the Samsung TTS engine, the Brain Health voice-biomarker service, and Samsung's strategic deployment of voice-AI capability across Samsung's product portfolio and developer ecosystem.

H.      *Non-Duplication.* Order such relief as the Court determines necessary to ensure no duplicative recovery across statutory, common-law, and equitable claims.

I.      *Attorneys' Fees and Costs.* Award reasonable attorneys' fees and litigation costs under 740 ILCS 14/20, 765 ILCS 1075/55, 815 ILCS 505/10a, 815 ILCS 510/3, and any other applicable provision.

J.      *Pre- and Post-Judgment Interest.* Award pre- and post-judgment interest as permitted by law.

K.      *Service Awards.* Award service awards to Plaintiffs in such amount as the Court deems appropriate to compensate them for their services to the Class.

L.      *Other Relief.* Grant such other and further relief as the Court deems just and proper.

## JURY TRIAL REQUESTED

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 13, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

_____

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Yohance Lacour, Philip Rogers, Carol Marin, Robin Amer, Lindsey Dorcus, and Victoria Nassif.*