**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VICTORIA NASSIF, CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, LINDSEY DORCUS, ROBIN AMER, and YOHANCE LACOUR, each individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., a Korean corporation, and SAMSUNG ELECTRONICS AMERICA, INC., a New York corporation,<br><br>Defendants. | ) | Case No. 1:26-cv-05567<br><br>Hon. Jeremy C. Daniel |

**PLAINTIFFS' OPPOSITION TO**
**SAMSUNG ELECTRONICS CO., LTD.'S MOTION TO DISMISS**

## TABLE OF CONTENTS


Page

I. Introduction ..... 1

II. The Court Must Assess the Whole Jurisdictional Record ..... 2

III. Hong Covers Illinois Sales, Not SEC's Model Supply and Control ..... 2

IV. SEC's Own Conduct Connects It to Illinois ..... 4

- A. SEC Acted Through Its Own Research Organization. ..... 4
- B. SEC Delivers Its Models Into Illinois Through the Channel It Chose. ..... 4

V. The Claims Relate to SEC's Illinois-Directed Channel ..... 7

VI. The Complaint Pleads Conduct Aimed at Illinois, Not Merely at Illinois Residents ..... 10

VII. Alternatively, SEA's Directed Illinois Conduct Is Attributable to SEC ..... 11

VIII. Jurisdiction Over SEC Is Fair ..... 12

IX. At Minimum, Narrow Jurisdictional Discovery Should Precede Dismissal ..... 13

X. SEC's Adopted Merits Arguments Do Not Warrant Dismissal ..... 14

XI. Conclusion ..... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*B.D. ex rel. Myer v. Samsung SDI Co.*,
91 F.4th 856 (7th Cir. 2024) ........................................ 13

*B.D. ex rel. Myers v. Samsung SDI Co.*,
143 F.4th 757 (7th Cir. 2025) ........................................ 4, 5, 7, 8

*Brantley v. Prisma Labs, Inc.*,
2024 WL 3673727 (N.D. Ill. Aug. 6, 2024) ........................................ 10

*Calder v. Jones*,
465 U.S. 783 (1984) ........................................ 10

*Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*,
230 F.3d 934 (7th Cir. 2000) ........................................ 11, 12, 14

*Curry v. Revolution Labs., LLC*,
949 F.3d 385 (7th Cir. 2020) ........................................ 2, 5, 8, 12

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ........................................ 12

*Deyerler v. HireVue, Inc.*,
2024 WL 774833 (N.D. Ill. Feb. 26, 2024) ........................................ 5, 8

*Deyerler v. HireVue, Inc.*,
2025 WL 4109046 (N.D. Ill. Nov. 21, 2025) ........................................ 5

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) ........................................ 7, 11

*Gruca v. Alpha Therapeutic Corp.*,
19 F. Supp. 2d 862 (N.D. Ill. 1998) ........................................ 6

*Gutierrez v. Wemagine.AI LLP*,
2022 WL 252704 (N.D. Ill. Jan. 26, 2022) ........................................ 10

*J.S.T. Corp. v. Foxconn Interconnect Tech. Ltd.*,
965 F.3d 571 (7th Cir. 2020) .......... 9

*Matlin v. Spin Master Corp.*,
921 F.3d 701 (7th Cir. 2019) .......... 2

*McGoveran v. Amazon Web Servs., Inc.*,
488 F. Supp. 3d 714 (S.D. Ill. 2020) .......... 10

*Mutnick v. Clearview AI, Inc.*,
2020 WL 4676667 (N.D. Ill. Aug. 12, 2020) .......... 10

*Palen v. Daewoo Motor Co.*,
358 Ill. App. 3d 649, 832 N.E.2d 173 (Ill. App. Ct. 2005) .......... 12

*Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*,
338 F.3d 773 (7th Cir. 2003) .......... 2

*Rogers v. City of Hobart*,
996 F.3d 812 (7th Cir. 2021) .......... 11

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*,
786 F.3d 510 (7th Cir. 2015) .......... 15

*Schoeps v. Sompo Holdings, Inc.*,
160 F.4th 815 (7th Cir. 2025) .......... 7, 9

*Sembos v. Philips Components*,
376 F.3d 696 (7th Cir. 2004) .......... 4

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
549 U.S. 422 (2007) .......... 15

*Walden v. Fiore*,
571 U.S. 277 (2014) .......... 10

**Statutes**

740 ILCS 14/5 .......... 12

740 ILCS 14/15(b) .......... 1

740 ILCS 14/15(d) .......... 15

**Rules**

Fed. R. Civ. P. 12(b)(6) .......... 14

Fed. R. Civ. P. 15(a)(2) .......... 15

Fed. R. Civ. P. 26(d)(1) .......... 14

Fed. R. Civ. P. 26(f) .......... 14

Fed. R. Civ. P. 30(b)(6) .......... 14

Fed. R. Civ. P. 41(b) .......... 15

## I. Introduction

Samsung Electronics Co., Ltd. ("SEC") tells the Court that it "does not conduct, and has never conducted, business anywhere in the State of Illinois." (R. 22 ¶ 8.)[1]

Its AI voice models work here every day. Every Galaxy phone sold in Illinois ships with software that uses them. When an Illinois user speaks to Bixby, translates a call, or uses text-to-speech, SEC's models power Samsung's voice features (the "Voice Products"). (R. 1 ¶¶ 4, 20, 32, 70.) SEC owns those models. It built them through its own research organization, under its own officers, and, the Complaint alleges, controls when and how it releases them. (*Id.* ¶¶ 20, 23, 35.) It sends them here through Samsung Electronics America, Inc. ("SEA"), the subsidiary that, SEC's declarant says, markets, distributes, and sells in Illinois. (R. 22 ¶¶ 9–10.)

The Complaint alleges that SEC built those models by extracting voiceprints from human voices without asking, including the voices of seven Illinois journalists, podcasters, and narrators, and that those voiceprints and biometric information derived from them persist in the models SEC sends here. (R. 1 ¶¶ 13–19, 23, 45, 70, 77, 161.) Illinois law required SEC to ask first. 740 ILCS 14/15(b). The Complaint says why it did not: Samsung "chose speed and scale over compliance." (R. 1 ¶ 109.)

SEC's answer is not that it asked. It is that it was never here. SEC need not set foot in Illinois to create a contact here. The claimed connection is its knowing supply and continuing operation of models that allegedly use Plaintiffs' identifying information to serve Illinois users. Plaintiffs ask SEC to answer for that conduct, not for the mere sale of its products here. (R. 1 ¶¶ 20, 35, 70, 74, 161.)

[1] Citations to "R." refer to this Court's docket; page citations are to the page numbers in the ECF header.

## II. The Court Must Assess the Whole Jurisdictional Record

Plaintiffs invoke only specific jurisdiction over SEC. (R. 1 ¶ 34.) On a written record without an evidentiary hearing, they need only make a prima facie showing. *Curry v. Revolution Labs., LLC*, 949 F.3d 385, 393 (7th Cir. 2020).

SEC submitted a declaration from Andrew Hong (R. 22, the "Hong Declaration"). Plaintiffs therefore must "submit affirmative evidence supporting the court's exercise of jurisdiction." *Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019). They do, with SEC's own published terms and policies. (Sections III–IV; Declaration of Ross Kimbarovsky ("Kimbarovsky Decl.") Exs. B, D–G.) That requirement does not remove the Complaint's well-pleaded allegations from the jurisdictional record. *Matlin*, 921 F.3d at 705. The Court considers the allegations and submissions together: it accepts as true well-pleaded allegations and affidavit facts that do not conflict with the record, and it resolves factual conflicts in Plaintiffs' favor. *Curry*, 949 F.3d at 392–93; *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Hong's statement that SEC "does not conduct, and has never conducted, business anywhere in the State of Illinois" (R. 22 ¶ 8) is partly a legal characterization. Its factual content is assessed with the rest of the record; whether SEC's conduct amounts to Illinois contacts is for the Court, not the declarant. *See Purdue*, 338 F.3d at 783 & n.13. The question is whether the whole record establishes a prima facie case for jurisdiction.

## III. Hong Covers Illinois Sales, Not SEC's Model Supply and Control

Every denial Hong makes is limited to conduct "in the State of Illinois," and each rests on an either-or foundation: "either direct knowledge of the facts or investigation and verification of the facts with individuals having direct knowledge," without saying which, with whom, or for what period. (R. 22 ¶¶ 2–3, 8–15.) That limitation speaks only to where SEC acted, and even

there SEC's own license and service terms contradict paragraphs 8 through 10. (*See* Section IV.B.) Specific jurisdiction asks a different question: whether SEC's own conduct, wherever it occurred, reached Illinois, and whether the claims relate to that reach. As Section IV explains, a manufacturer can avail itself of a forum through products it knowingly supplies there, without acting in the forum. Hong's denials, even where true, do not answer that question.

Hong assigns Illinois supply, marketing, distribution, and sales to SEA (R. 22 ¶¶ 9–10), and the Complaint agrees; Plaintiffs do not attribute SEA's retail sales to SEC. But the Complaint also alleges that SEC owns and operates the foundational models and controls their releases and updates. (R. 1 ¶¶ 20, 23, 25, 31–32, 35, 74.) Hong does not address that supply or those decisions. Nor does paragraph 9's denial of "services in the State of Illinois" account for SEC's own U.S. license and service terms, which make SEC the licensor and provider of the software and voice services on Samsung devices. (*See* Section IV.B.)

Paragraphs 12 and 13 state that SEC "did not and does not" participate in training the models, or collect, extract, train, or store data used to research, develop, or train them, "in the State of Illinois." (R. 22 ¶¶ 12–13.) Those statements answer a theory Plaintiffs do not advance. Jurisdiction under Sections IV and V does not depend on where the models were trained or their data gathered; it rests on SEC's supply and control of models that reach Illinois through SEA and remain in use there. Even if true, those paragraphs leave that basis untouched.

Paragraphs 14 and 15 are similarly limited, and narrower still in time. They deny that SEC directed SEA or Samsung Research America ("SRA") personnel's training or data work "in the State of Illinois." (*Id.* ¶¶ 14–15.) Paragraphs 12 and 13 speak in both tenses, saying that SEC "did not and does not"; paragraphs 14 and 15 say only that SEC "did not." Whatever the Illinois phrase modifies, both concern past direction of development work, and neither addresses SEC's

supply of the models to SEA or its continuing control of their releases, updates, and deployment. If the Court considers either paragraph material, its scope and period are questions for the discovery requested in Section IX, not grounds for reading it more broadly than its words.

SEC's memorandum says that "SEC did not direct or instruct SEA or ... SRA personnel in Illinois." (R. 21 at 5.) That paraphrase drops paragraph 14's restriction to personnel involved in training and data work. It cannot enlarge that paragraph into a denial of SEC's release, update, or deployment decisions. A memorandum is not evidence.

## IV. SEC's Own Conduct Connects It to Illinois

### A. SEC Acted Through Its Own Research Organization.

The Complaint assigns the voice-AI work to SEC itself. Samsung Research is "the advanced research and development hub of Samsung Electronics' SET (End-Products) Business," and SEC's officers direct the research through it. SEC owns the resulting models, has not delegated their development or commercialization to a subsidiary, and allegedly obtained Plaintiffs' voiceprints through that research operation. (R. 1 ¶¶ 20, 22–23.) Even SEC's memorandum, recounting the Complaint, calls Samsung Research "a division of SEC." (R. 21 at 7.) Work done through a corporation's own internal organization is the corporation's conduct. *See Sembos v. Philips Components*, 376 F.3d 696, 702 (7th Cir. 2004). That makes SEC the alleged actor; Section IV.B addresses its Illinois connection.

### B. SEC Delivers Its Models Into Illinois Through the Channel It Chose.

SEC's contact is its own knowing supply of Bixby and other Voice Products for SEA's Illinois services, not SEA's contacts attributed to its parent. This Circuit applies the "knowledge version" of the stream-of-commerce theory: a supplier purposefully avails itself of a forum when it supplies its product knowing the final product is marketed there. *B.D. ex rel. Myers v. Samsung*

*SDI Co.*, 143 F.4th 757, 767–68 (7th Cir. 2025) ("*B.D.* (2025)"). In *B.D.* (2025), the manufacturer reached Indiana through corporate customers that incorporated its batteries into consumer products; direct sales to Indiana consumers were unnecessary. *Id.* at 768.

This Court drew the same line in *Deyerler v. HireVue, Inc.* The vendor there knowingly contracted with an Illinois-headquartered employer that used its software to interview a plaintiff in Illinois, and the contact was the vendor's own knowing provision of the software, not the employer's contacts attributed to it. 2024 WL 774833, at *2–3 (N.D. Ill. Feb. 26, 2024). The Court reaffirmed the point last year: HireVue, "not its third-party clients, deliberately initiated contacts with and directed its conduct to Illinois," which is "distinct from the unilateral activity of a third party." *Deyerler v. HireVue, Inc.*, 2025 WL 4109046, at *2 n.3 (N.D. Ill. Nov. 21, 2025). SEC's intermediary is not itself an Illinois company, but *B.D.* (2025) shows that knowing supply through an intermediary serving the forum can establish purposeful availment.

Here, SEC allegedly owns and operates the models, controls their releases and updates, and supplies them for SEA to deploy to Illinois users (R. 1 ¶¶ 20, 23, 35, 74), and Hong confirms that SEA handles the Illinois functions SEC disclaims (R. 22 ¶¶ 9–10). That is knowing supply through SEA, not a product's accidental arrival in Illinois.

Nor is SEA's role "limited to selling devices in Illinois," as SEC argues. (R. 21 at 3.) SEA allegedly controls the software that invokes SEC's models on Illinois devices, operates the infrastructure processing Illinois users' requests, and collects their voice data. (R. 1 ¶¶ 25(b)–(c), 32.) Those are the continuing services through which SEC's models reach Illinois users.

To the extent Hong's paragraphs 8 and 9 contradict SEC's role in those services, SEC's own published terms supply contrary evidence, and conflicts are resolved in Plaintiffs' favor. *Curry*, 949 F.3d at 393. Samsung's U.S. mobile end-user license agreement, which defines SEC

as "Samsung," grants the license to the software preinstalled on Samsung devices, provides for updates that may download automatically, and states that, to provide voice-based features, "we may require the collection of your voice information." (Kimbarovsky Decl. Ex. F, EULA introductory ¶ at printed page 8/24 & §§ 4–5, 7–8 (updated Feb. 5, 2024).) Samsung's U.S. service terms likewise identify SEC as the provider of services that include Bixby, Transcript Assist, real-time call translation, and Interpreter. (*Id.* Ex. D at 1, 14–15 (posted July 27, 2026); *see id.* Ex. E (2021 terms and linked services list).) SEC's Bixby developer agreement reserves SEC's right to update the "Samsung Service," defined to include its intelligent personal assistant, "at any time without notice," and requires developers to conform within thirty days. (*Id.* Ex. G §§ 1.18, 2.6(a) (effective Nov. 7, 2018).) The 2025 U.S. Privacy Policy also names SEC as data controller and permits use of U.S. residents' information to train AI models. (*Id.* Ex. B at 1–2, 6.) These documents identify SEC's own contractual licensing and service functions, including functions performed with affiliates. Read with the pleaded Illinois deployment, they support SEC's participation in the services supplied here, not merely ownership of SEA. (R. 1 ¶¶ 20, 32, 35, 74.)

*Gruca* treated a subsidiary's marketing, sale, or servicing of its parent's products in Illinois as "a crucial factor" in Illinois's parent-subsidiary decisions and noted that one could be read as "a variation of" stream-of-commerce jurisdiction. *Gruca v. Alpha Therapeutic Corp.*, 19 F. Supp. 2d 862, 871 & n.9 (N.D. Ill. 1998). It found jurisdiction lacking under Illinois's doing-business test because, on a developed record, the subsidiary did not market, sell, or service the parent's products in Illinois and the parent did not substantially control it. *Id.* at 871–72. Here, the Complaint identifies SEA as the company deploying SEC's models in Illinois, and Hong confirms SEA's Illinois role. (R. 1 ¶¶ 20, 74; R. 22 ¶¶ 9–10.) *Gruca*'s second missing element is

alleged as well: SEC "retains and exercises the right of control" over SEA's work with the Voice Products (R. 1 ¶¶ 26, 35; *see* Section VII), and SEC's own terms reserve its authority to update the software and services.

SEC separately argues that the alleged sales through SEA do not relate to Plaintiffs' claims. (R. 21 at 9.) Availment and relatedness are distinct requirements. *Schoeps v. Sompo Holdings, Inc.*, 160 F.4th 815, 827–28 (7th Cir. 2025). Availment asks what the defendant did to reach the forum; relatedness asks whether these claims connect to that reach. *B.D.* (2025) shows the difference: the manufacturer had availed itself of Indiana through one stream of products, but the injury came through a different stream it had not exploited. 143 F.4th at 771–74. Section V shows that Plaintiffs' claims arrive through the channel SEC chose.

## V. The Claims Relate to SEC's Illinois-Directed Channel

SEC argues that its sales of devices through SEA cannot support jurisdiction because the claims concern "how the AI Models and Voice Products came to be—not the channels by which they are distributed to market." (R. 21 at 9.) Plaintiffs agree that device sales alone would not suffice: activity in a forum supports jurisdiction only over claims related to that activity. *B.D.* (2025), 143 F.4th at 774. Relatedness does not require strict causation, but it has "real limits." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021). The Illinois activity here is not the sale of devices. It is the continuing operation, for Illinois users, of models the Complaint alleges carry Plaintiffs' voiceprints and biometric information derived from them—the possession, use, transfer, and delivery the later claims challenge. (R. 1 ¶¶ 70, 74, 161.) SEC's own summary of the claims lists the "possession, ... exploitation, and/or use of Plaintiffs' voiceprints ... in the AI Models and Voice Products." (R. 21 at 7.) How the models came to be is Count I's subject, addressed below.

That SEC also serves other markets does not make its Illinois channel less deliberate. *Curry*, 949 F.3d at 399. Nor does paragraph 78 "disclaim any purchase or use of Samsung-branded devices," as SEC says (R. 21 at 9); it alleges only that no Plaintiff created a Samsung Account authorizing voice use, uploaded a recording for that purpose, "invoked any Samsung voice-AI product," or accepted voice-product terms (R. 1 ¶ 78). Plaintiffs challenge SEC's use of their information, not an injury suffered while using a device.

That connection is pleaded concretely. The Complaint alleges, on information and belief, that voiceprints and biometric information derived from Plaintiffs' Illinois-produced recordings persist in the foundational models deployed and operated for Illinois users. (R. 1 ¶¶ 70, 77, 161.) SEC allegedly owns and operates those models, which SEA's software invokes on Illinois devices. (*Id.* ¶¶ 20, 32, 74.) The Hong Declaration's development-location denials do not contradict the alleged retention. (R. 22 ¶¶ 12–15; *see* Section III.) The Court must decide that connection now, even though the same facts bear on the merits, *B.D.* (2025), 143 F.4th at 772, and at this stage the uncontradicted, well-pleaded allegation is taken as true (Section II). Each named Plaintiff alleges the acquisition and continuing use of his or her own voiceprints, so the connection runs to each of them. *See Deyerler*, 2024 WL 774833, at *3.

Counts II, IV, and V concern SEC's continuing possession of identifying information without the required policy, its transfer of voiceprint-bearing models to separate recipients, and its protection of that information during storage and transmission for Illinois services. (R. 1 ¶¶ 70, 74, 161–162, 174, 179–181.) Plaintiffs rely on that continuing handling, not an assumption that every audio response carries model weights.

For Count III, the licensing and retention allegations, read with SEC's operation of the models, support the inference of paid access to retained identifying information through the TTS

engine, not licensing revenue from improved software alone. (*Id.* ¶¶ 23, 72(d), 74, 161, 168.)

Counts VI and VIII concern SEC's delivery of imitations and the resulting confusion about a particular Plaintiff's performance or authorization. (*Id.* ¶¶ 70, 74, 189–192, 205.) Count VII challenges continuing exploitation that causes Plaintiffs' own economic losses; Count IX concerns SEC's own benefits from that Illinois-serving use, not SEA's revenue automatically attributed to SEC. (*Id.* ¶¶ 23, 74, 197–198, 200, 211–212.)

Two Seventh Circuit decisions mark the limits of that connection; neither forecloses it. In *J.S.T. Corp. v. Foxconn Interconnect Technology Ltd.*, the defendants allegedly misappropriated trade secrets outside Illinois and sold connectors to Bosch in Texas and China; General Motors made the later Illinois sales, which did not enrich them. 965 F.3d 571, 575–78 (7th Cir. 2020). In *Schoeps*, the conversion preceded the disputed painting's Chicago exhibition, and its reciprocal loan benefit did not support unjust-enrichment jurisdiction. 160 F.4th at 829–30. Here, SEC allegedly still operates and controls the models for Illinois service and benefits from that use. (R. 1 ¶¶ 20, 35, 70, 74, 161, 191, 211–212.) The later claims challenge that ongoing handling, exploitation, and public use, not an earlier taking connected to Illinois only by the same object's later presence. The distinction is SEC's continuing conduct and benefit, not its ownership of SEA.

SEC argues that Plaintiffs' own Illinois connections—their residence, the "situs" of their recordings, where they recorded and published, and the platform metadata identifying them as Illinois speakers—cannot supply SEC's contacts. (R. 21 at 8–9.) Those facts alone cannot supply SEC's contacts. Jurisdiction rests on what SEC itself allegedly does: it knowingly supplies its models for Illinois service through SEA and continues to use Plaintiffs' identifying information in the models that serve Illinois users. (Sections IV.B.) SEC's cases lacked exactly that.

*Gutierrez v. Wemagine.AI LLP*, 2022 WL 252704, at *2 (N.D. Ill. Jan. 26, 2022) (only connection was plaintiff's download of an app); *Brantley v. Prisma Labs, Inc.*, 2024 WL 3673727, at *7–8 (N.D. Ill. Aug. 6, 2024) (third party's scraping and nationwide revenue; no Illinois-directed conduct); *McGoveran v. Amazon Web Servs., Inc.*, 488 F. Supp. 3d 714, 722–24 (S.D. Ill. 2020) (contacts created by plaintiffs' calls, not by defendants). Whether SEC's acquisition was itself aimed at Illinois material is a separate question, addressed in Section VI.

Plaintiffs do not contend that the Illinois sales caused SEC's collection of their voiceprints. Count I links SEC's obtaining through Samsung Research to its continued use of that information in models serving Illinois. (R. 1 ¶¶ 23, 32, 70, 74, 154–155.) *Mutnick v. Clearview AI, Inc.* sustained jurisdiction over collection coupled with Illinois sales of access to the resulting biometric database. 2020 WL 4676667, at *2–4 (N.D. Ill. Aug. 12, 2020). SEC supplies voice services rather than database access, but the asserted connection concerns continued use of the collected information itself. That is a forum argument, not an added retention element for Count I or Count II's policy duty at first possession.

## VI. The Complaint Pleads Conduct Aimed at Illinois, Not Merely at Illinois Residents

SEC argues that the Complaint pleads no conduct expressly aimed at Illinois. (R. 21 at 9–10.) *Calder* shows what such conduct looks like. The defendants drew on California sources for an article about a California entertainer's California activities and injured her reputation through publication there; California was "the focal point both of the story and of the harm suffered." *Calder v. Jones*, 465 U.S. 783, 788–90 (1984). *Walden* later explained that the article's publication in California, combined with the facts that gave it a California focus, connected the defendants to California itself, not merely to a plaintiff who lived there. *Walden v. Fiore*, 571 U.S. 277, 287–88 (2014).

The Complaint alleges contacts of both kinds. *First*, Illinois sources: SEC "targeted identifiably Illinois-origin recordings" and, on information and belief, acquired them through direct access to archives including those of NBC 5 Chicago, WTTW, and Media Burn, a Chicago-based nonprofit. (R. 1 ¶¶ 36, 63, 69.) The individual allegations place Marin's work in those archives and Rogers's in NBC 5's, each displayed with the speaker's name and Chicago as the production location. (*Id.* ¶¶ 84, 87.) The acquisition is the asserted contact; the displayed attribution supports the inference of knowledge. *Second*, delivery into Illinois: SEC allegedly supplies and controls models that continue using Plaintiffs' identifying information for Illinois services and that deliver imitations of their voices here. (*Id.* ¶¶ 35–36, 70, 74, 161, 191.) Plaintiffs rely on that acquisition and that delivery, not on Illinois injury alone or a statistical inference from a training set's size. (*See* R. 21 at 10.)

*Rogers v. City of Hobart* marks the limit. An Indiana officer's use of Illinois identification data obtained through a third-party database, followed by entry of a warrant in a national database, was not Illinois-directed conduct, and the court reached the same result after considering *Ford*. 996 F.3d 812, 820 & n.14 (7th Cir. 2021). The officer relied on data a third-party database supplied. SEC allegedly went directly to Illinois sources and delivers the results back into Illinois. The facts that would confirm the acquisition—the acquiring entity, sources, dates, and transaction geography—are in SEC's hands, and topic 6 in Section IX seeks them.

## VII. Alternatively, SEA's Directed Illinois Conduct Is Attributable to SEC

Alternatively, Plaintiffs seek attribution of the Illinois acts SEA allegedly performs under SEC's operational direction. *Reimer* bars jurisdiction premised on "corporate affiliation or stock ownership alone where corporate formalities are substantially observed and the parent does not exercise an unusually high degree of control over the subsidiary." *Cent. States, Se. & Sw. Areas*

*Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). The Complaint alleges more than affiliation. SEA "undertook to market, distribute, support, and operate the Voice Products in the United States," and SEC "retains and exercises the right of control" over that work, including the releases, updates, and model deployment SEA implements through the software it controls on Illinois devices. (R. 1 ¶¶ 26, 32, 35.)

SEC relies on *Palen v. Daewoo Motor Co.* (R. 21 at 11.) But *Palen* applied Illinois's doing-business test to an extensive discovery record showing the subsidiary set its own policies and prices. The parent's creation of the subsidiary and election of its first board, help launching its sales, and shared promotion were insufficient, and there was no evidence of any obligation on the subsidiary to service the parent's products. 358 Ill. App. 3d 649, 664–65, 832 N.E.2d 173, 186–87 (Ill. App. Ct. 2005). Here, SEC's declarant identifies SEA as handling the Illinois functions SEC disclaims (R. 22 ¶¶ 9–10), and the alleged directions govern the software SEA deploys and operates, not corporate governance alone (R. 1 ¶¶ 26, 32, 35).

*Daimler* rejected an agency theory for general jurisdiction, *Daimler AG v. Bauman*, 571 U.S. 117, 136 (2014), but recognized that a corporation can purposefully avail itself of a forum "by directing its agents or distributors to take action there," *id.* at 135 n.13. Plaintiffs seek attribution of those directed acts; the claim-specific connection is addressed in Section V. Topic 3 in Section IX addresses any remaining question of control.

## VIII. Jurisdiction Over SEC Is Fair

SEC raises no fairness objection and identifies no litigation burden. Once claim-related minimum contacts are shown, a defendant must present a compelling case that jurisdiction would be unreasonable. *Curry*, 949 F.3d at 402. Illinois has a strong interest in its residents' biometric privacy, and all seven Plaintiffs seek relief at home. 740 ILCS 14/5; R. 1 ¶¶ 13–19. Resolving the

claims against both Defendants here also avoids duplicating the same dispute.

## IX. At Minimum, Narrow Jurisdictional Discovery Should Precede Dismissal

If the Court finds the present showing insufficient, it should permit narrow jurisdictional discovery before dismissing. A colorable or prima facie showing suffices. *B.D. ex rel. Myer v. Samsung SDI Co.*, 91 F.4th 856, 864 (7th Cir. 2024). There, the Seventh Circuit identified what the record left open—what the manufacturer knew about where its products went, and whether its contacts related to the injury—and remanded for discovery that "could yield facts as to whether [the defendant's] contacts with Indiana are related to the injury." *Id.* at 863.

That showing is made here. Hong leaves SEC's model supply, release control, and model operation unaddressed (Section III), and SEC's own terms describe it licensing, providing, and updating the Voice Products for U.S. users (Section IV.B). The 2025 U.S. Privacy Policy also names SEC as data controller and states that covered personal information "will be transferred to the Republic of Korea." (Kimbarovsky Decl. Ex. B at 4, 6.) The requested records would test how those roles connect to the alleged continuing use of Plaintiffs' identifying information in models serving Illinois users. (R. 1 ¶¶ 70, 161.)

Plaintiffs seek documents sufficient to show, and interrogatory answers, confined to the pleaded Voice Products and their relevant periods, on eight topics: (1) which model versions serve Illinois users, who develops, receives, deploys, and controls them, and what speaker-identifying information they retain and use; (2) which entities and locations process Illinois requests and who controls or can access that information; (3) SEC's supply of the models and its role in U.S. releases and updates, including under its license and developer terms; (4) transfers of models, speaker measurements, or data among SEC, SEA, SRA, and service providers; (5) who employs and operates the research units, including SEA's operation of SRA; (6) the acquiring

entity, sources, dates, transaction geography, source-selection criteria and instructions, and retained name and location information for the recordings; (7) the Hong Declaration's factual basis and period; and (8) responsibility for, and earlier versions of, the U.S. Privacy Policy, Data Privacy Framework policy, and AB 2013 summary. Plaintiffs seek all eight from SEC and only topics 1, 2, and 5 from SEA. They do not seek training corpora, model weights, source code, or customers' recordings.

*Reimer* cautioned against extensive jurisdictional discovery of foreign defendants and upheld denial of requests unable to establish claim-related contacts, but noted the court "might have decided to permit more narrowly targeted discovery." 230 F.3d at 946–47. Each request targets the disputed connection among SEC, Plaintiffs' information, and Illinois service.

Plaintiffs request authorization under Rule 26(d)(1), since there was no Rule 26(f) conference. Plaintiffs' proposed order provides 60 days, documents and written answers first, one limited Rule 30(b)(6) deposition per defendant only if a gap remains, a protective order, and ten-page supplemental briefs within 21 days after discovery closes, with merits defenses reserved.

**X. SEC's Adopted Merits Arguments Do Not Warrant Dismissal**

SEC adopts SEA's Rule 12(b)(6) arguments by reference. (R. 21 at 2, 12.) Plaintiffs incorporate Sections IV–X of their SEA opposition, addressing territoriality and Counts I–IX, and Section II's merits standard, under which the Hong Declaration plays no role on the merits. Three additional points concern SEC's own conduct.

*First*, SEA attributes any control of the biometric data to "non-defendants Samsung Research or SRA." (R. 24 at 24.) But the Complaint alleges that SEC obtained Plaintiffs' voiceprints through its own Samsung Research operation. (R. 1 ¶¶ 20, 22–23; see Section IV.A.)

*Second*, Count IV includes SEC's disclosure to SEA. The Complaint alleges that SEC

operates models retaining Plaintiffs' voiceprints, SEA deploys those models, and the encoded information is disseminated through those operations. (R. 1 ¶¶ 20, 74, 161, 174.) Those allegations support a transfer between separate corporations, and onward sharing with affiliates, vendors, and service providers, not movement among SEC's internal departments. Corporate affiliation is not among § 15(d)'s disclosure exceptions. 740 ILCS 14/15(d).

*Third*, Count IX seeks SEC's own benefits from the alleged taking and exploitation, including avoided licensing and consent costs, model capabilities, and attributable commercial gains obtained at Plaintiffs' expense. (R. 1 ¶¶ 23, 74, 211–214.) That theory does not treat SEA's revenue as SEC's, and Count I supports restitution of development-stage benefits without proof of final-model retention. Plaintiffs seek no duplicate recovery. (*Id.* ¶ 209.)

## XI. Conclusion

The Court should deny SEC's motion. Alternatively, it should permit the limited discovery described in Section IX before any jurisdictional dismissal. Any dismissal for lack of personal jurisdiction must be without prejudice and cannot reach the merits. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007); Fed. R. Civ. P. 41(b). SEC requests dismissal with prejudice in the alternative. (R. 21 at 12.) If the Court reaches the merits, Plaintiffs request a count-by-count ruling, dismissal without prejudice of any deficient claim, and leave to amend under Rule 15(a)(2). This is the first complaint, and SEC has not established that amendment would be futile. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015). Plaintiffs also request leave to cure any identified jurisdictional pleading deficiency with supported facts concerning SEC's own claim-related conduct.

Dated: October 6, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

______________________________

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Victoria Nassif, Carol Marin, Philip Rogers, Alison Flowers, Lindsey Dorcus, Robin Amer, and Yohance Lacour*